**AVIATION ENTERPRISES, INC.**

v.

**The UNITED STATES.**

**No. 81–85C.**

United States Claims Court.

April 10, 1985.

David H. Cox, Washington, D.C., attorney of record for plaintiff. Jackson & Campbell, Washington, D.C., of counsel.

Terrence S. Hartman, Washington, D.C. with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., attorney of record for defendant.

## OPINION

LYDON, Judge:

This case centers on the propriety of the cancellation of a solicitation by the United States Air Force and its subsequent failure to resolicit. Defendant has moved to dismiss plaintiff's request for equitable relief based on the court's lack of equitable jurisdiction over the matter. On February 8, 1985, plaintiff filed a complaint in this court requesting a temporary restraining order (TRO). Concurrently, plaintiff also filed a verified complaint for a TRO, a preliminary injunction, and other equitable and legal relief, including bid preparation costs. Plaintiff requested that this court nullify the cancellation of a Request for Proposals (RFP) by defendant and order the reissuance of the RFP. By order dated February 12, 1985, the court denied plaintiff's motion for a TRO and established a schedule for expedited proceedings on plaintiff's request for further injunctive and legal relief. On March 15, 1985, defendant filed a motion to dismiss plaintiff's claim for equitable relief, to which plaintiff filed an opposition.

Plaintiff now seeks to have the court direct the Air Force to reinstate the cancelled solicitation and provide the bidders with an opportunity to have their bids considered fairly and honestly by the Air Force. In addition and/or alternatively plaintiff seeks bid preparation costs associated with the cancelled solicitation. A hearing on the merits was held during which both parties presented testimony and documentary evidence. After carefully considering the submissions of both parties, the record of the hearing and pertinent case law, and after oral argument, the

court concludes that it does have jurisdiction over plaintiff's equitable claim relating to the cancellation but does not have jurisdiction over plaintiff's equitable claim relating to the failure of the Air Force to reinstate the cancelled solicitation or to resolicit the procurement which was the subject of the cancellation. As is evident, there are two primary areas requiring consideration by the court in this case. The first involves the cancellation of the RFP in question, and the second centers on the obligation to resolicit.

### I. *Cancellation*

### A. *Jurisdiction*

On April 3, 1984, defendant issued a Request for Proposals (RFP F04735–84–R–0004). This RFP was a 100 percent set-aside for small business concerns. The RFP sought proposals from small businesses to supply four aircraft, on a lease basis, for use by the United States Air Force (USAF) at Nellis Air Force Base. Plaintiff had the existing contract to supply four leased aircraft to Nellis Air Force Base, but said contract was due to expire on November 9, 1984. Plaintiff, along with five other companies, timely submitted responses and offers to the RFP. After technical evaluations, those offerors whose proposals were found to be technically acceptable were requested to and, with the exception of one technically acceptable offeror, did submit best and final offers. The contracting officer apparently determined that Ratliff Aero Sales, Inc. (Ratliff Aero) was the lowest responsive, responsible bidder and anticipated awarding the contract to said company.

Plaintiff became aware of this anticipated award and protested Ratliff Aero's small business characterization[1] and the technical compliance of Ratliff Aero's aircraft (Learjet Model 25G) to the specifications set out in the RFP. However, during the pendency of plaintiff's protest to the General Accounting Office (GAO) concerning technical compliance of the Learjet

Model 25G, the RFP solicitation was cancelled by the contracting officer. Said cancellation occurred on or about September 26, 1984, and notice of the cancellation was sent out by Telex on the same date to all offerors. The cancellation was based upon an overstatement of the minimum needs of the Air Force which restricted competition. On October 9, 1984, the GAO issued a letter opinion stating it would not consider plaintiff's protest of the anticipated award of the contract to Ratliff Aero because the cancellation of the RFP rendered the protest academic.

On October 15, 1984, plaintiff submitted a letter to the GAO protesting the cancellation of the RFP. This protest was summarily denied by decision dated October 19, 1984. On November 6, 1984, plaintiff requested the GAO to reconsider its initial decision denying plaintiff's protest of the cancellation. Again, the GAO denied the protest in a decision dated October 29, 1984. During the pendency of plaintiff's initial protest of the cancellation of the RFP to the GAO, plaintiff and the USAF entered into an agreement to extend plaintiff's previous contract to supply four aircraft to Nellis Air Force Base. Said contract would have expired on November 9, 1984, but it was extended until February 8, 1985. On the last day of this extension period, plaintiff filed its complaint in this court protesting the cancellation of the RFP and seeking equitable and legal relief associated with said protest.

Defendant argues that plaintiff filed its complaint in this case after the cancellation of the solicitation and thus at a time when no outstanding solicitation existed. Defendant, therefore, argues that absent an outstanding solicitation when the complaint was filed, this court has no jurisdiction to consider plaintiff's claim for equitable relief. Defendant bases its argument primarily upon *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1374 (Fed. Cir.1983) where the Federal Circuit Court

---

1. Plaintiff's challenge to Ratliff Aero's small business characterization was denied by the Small Business Administration.

of Appeals held that this court "lacked jurisdiction to hear and determine the * * * demand for equitable relief filed after the involved contracts were awarded."

The court finds *United States v. John C. Grimberg Co.* to be distinguishable from the case at bar. In *Grimberg*, contract bids were opened and the contract was actually awarded to one of the bidding companies. The plaintiffs in *Grimberg* protested the award of the contract to that particular bidder to the General Services Administration contracting officer but the award was upheld. The plaintiffs then sought equitable relief in this court. This court ruled that it lacked jurisdiction and that holding was upheld by the Federal Circuit Court of Appeals.

■ In this case, no contract was awarded. To the contrary, the solicitation was cancelled. Plaintiff in this case is challenging the manner in which defendant treated its bid once it was received. Once plaintiff submitted a proper bid in compliance with the solicitation, it was entitled to have its bid fully and fairly considered. *Ingersoll-Rand Co. v. United States*, 2 Cl.Ct. 373, 375 (1983). *See also United States v. John C. Grimberg Co., supra*, 702 F.2d at 1367 (implied contract exists to have bids fairly and honestly considered). Plaintiff essentially claims that its proposal was not fully and fairly considered because defendant improperly cancelled the solicitation. This court has stated that "[t]his type of claim falls squarely within the court's equitable jurisdiction."[2] *National Forge Co. v. United States*, 7 Cl.Ct. 530, 532 (Cl.Ct. 1985). *See also Kinetic Structures Corp. v. United States*, 6 Cl.Ct. 387, 392–93 (1984).

The fact that the cancellation of the RFP may have affected plaintiff in the same manner that it impacted on the other bidders does not alter this ruling. "The obligation of the government upon the issuance of a solicitation is to treat *all* bidders fairly and to give full consideration to all bids." *Heli-Jet Corp. v. United States*, 2 Cl.Ct. 613, 618 (1983) (as cited in *International Graphics, Division of Moore Business Forms, Inc. v. United States*, 4 Cl.Ct. 186, 192 (1983)) (emphasis supplied). This court stated in *International Graphics:*

The foregoing policy [treating *all* bidders fairly] underlying this court's bid protest jurisdiction would lose some, if not all, of its force if this court had the power to review unfair treatment of a *particular* bidder but was powerless to review equally unfair treatment of *all* bidders by the government. [4 Cl.Ct. at 192] (Emphasis supplied.)

■ Therefore, the court concludes that in a case such as this in which the plaintiff contends that the cancellation of a solicitation, to which it and others submitted bids, deprived it, and perhaps other bidders, of fair and full consideration of their bids, this court has equitable jurisdiction to review the propriety of the cancellation, despite the fact that the claim was filed with the court after the solicitation was cancelled. Based upon the above reasoning, the court denies defendant's motion to dismiss plaintiff's request for equitable relief relative to the cancellation claim.

### B. *Merits*

#### 1. *Facts*

The merits of this case present two primary issues. First, the court must determine whether the cancellation of the solicitation in this case was proper. Second, it is necessary for the court to determine if the USAF was required by the circumstances of this case and pertinent regulations to resolicit from small businesses for the provision of the four aircraft to be used for

---

**2.** The fact that plaintiff argues, in part, that the cancellation of the solicitation was improper due to regulatory violations does not affect the court's jurisdiction over this matter. Some of the regulations, cited by plaintiff, relating to small business set-asides and the associated cancellation provisions, constitute items of the implied contract of fair dealing between defendant and plaintiff which forms the basis of the court's jurisdiction under 28 U.S.C. § 1491(a)(3) (1982). *See National Forge Co. v. United States*, 7 Cl.Ct. 530, 532 (Cl.Ct.1985).

airlift operation purposes at Nellis Air Force Base. The following is a narrative of the facts, as ascertained at trial, which are relevant to these primary issues.

Prior to the issuance of the RFP at issue in this case on April 3, 1984, pilots and other USAF personnel involved in the using activity at Nellis Air Force Base participated in establishing specifications for the four aircraft which were to be solicited to replace the four Mitsubishi MU–II aircraft (MU–IIs) being supplied by plaintiff at that time.[3] Though the record indicates that the using activity personnel found the turbo-prop (propeller-type) MU–IIs to be adequate for their airlift missions, the specifications for the new aircraft required jet engines and a substantial increase in the aircraft's range capabilities. The record indicates that the airlift missions had not changed and were not anticipated to change in the future.

After the specifications were developed, the RFP was issued as a unilateral small business set-aside, Federal Acquisition Regulation (FAR) § 19.501(b), by the contracting officer.[4] Schedule B of the RFP stated:

"Contractor shall lease 4 (to include all maintenance, modifications, repair) to the government twin turbo-fan/turbo jet aircraft in accordance with Aircraft Specifications for USAF, dated 1984 MAR 12, 4 pages." The specifications in the RFP required the engines to be fan jets with thrust reversers and independent start capability. It appears that Schedule B would allow non-fan jet engines whereas the specifications required fan jet engines. After the RFP was issued plaintiff and other potential offerors contacted the contracting officer to clarify details in the RFP though the record indicates that none of the offerors questioned the engine requirement at that time. However, at some time prior to the technical evaluation of the proposals, Gates Learjet contacted the contracting officer by telephone to inquire whether turbo jet (the engine in a Learjet 25G) aircraft would meet the engine requirements of the RFP. The contracting officer found that Schedule B of the RFP clearly controlled and answered affirmatively. The contracting officer, Carroll Gamble (Gamble), testified that he felt the contract language was clear and thus no formal amendment was required nor was he required to inform the other bidders of his reading of the contract.

One particular specification in the RFP created a minor controversy. The initial specifications called for an external door

---

3. Plaintiff, Aviation Enterprises, Inc. (AEI), is a small business owned entirely by its president, James P. Flynn (Flynn), and his wife. Flynn started AEI around 1980 while he was still serving as president for another business, Federal Airways, which dealt with aircraft. At some point Flynn left Federal Airways to devote all of his time to AEI.

AEI, at the time relevant to this case, employed three to four people. Initially AEI employed three people including Flynn and his wife. At the end of 1984 AEI hired a fourth employee who is an attorney. AEI is in the business of buying, selling and leasing aircraft. It has regularly been involved in bidding on government solicitations. AEI received its first government contract in 1981 which was the contract to lease Mitsubishi MU–II aircraft to the United States Air Force for use at Nellis Air Force Base. The record indicates that AEI has been awarded other government contracts since that time.

The record also indicates that Flynn is an experienced pilot who has had extensive experience in selling and leasing aircraft. He has also

had substantial involvement as an offeror in the government procurement process.

4. The record indicates that the contracting officer, Carroll Gamble (Gamble) was not assigned to Nellis Air Force Base. Instead he was a civilian stationed at McClellan Air Force Base in Sacramento, California. Tactical Air Command (TAC), the command to which the using activity at Nellis Air Force Base was assigned, apparently determined that the procurement personnel at Nellis Air Force Base did not have sufficient expertise to acquire aircraft. TAC wished to avoid litigation surrounding procurements as was experienced when plaintiff got its then existing contract in 1981. Initially Captain Marvin Bobbitt, TAC Headquarters, was assigned as the contracting officer but the solicitation was transferred to Gamble during the period in which the specifications were being developed.

The court also notes that Gamble initially did not anticipate setting the solicitation at issue aside for small businesses, but after a protest by plaintiff, he did unilaterally set the procurement aside for small business concerns.

for direct access from outside the plane to at least one-half of the cargo area. Though the record is not clear concerning the purpose of such a door, it was apparently related to the classified nature of certain equipment transported on the aircraft. Additionally, the requirement for a separate cargo area was designed to make the passenger area as safe as possible. Regardless of its purpose, a representative of Gates Learjet Corporation, one of the manufacturers of the aircraft being proposed by two of the bidders, sent a Telex to the contracting officer requesting clarification of certain specifications and asking that the external door requirement be deleted. Apparently none of the proposed Gates Learjet aircraft had such an external door. The day after Gates Learjet sent a Telex to the contracting officer regarding the external door requirement, James A. Stempson (Stempson), a vice president at Gates Learjet and a former USAF Colonel contacted General Kelly (Gen. Kelly), Vice Commander of the Tactical Air Command (TAC), USAF, regarding deletion of the external door requirement.[5]

After discussing the suggestion that the external door requirement be deleted with the Technical Evaluation Team, the contracting officer denied the deletion request. However, Gen. Kelly agreed with the request and the contracting officer subsequently deleted the external door requirement through a formal amendment of the RFP.[6]

In May of 1984, the Technical Evaluation Team, which consisted of four officers from TAC stationed at Nellis Air Force Base, evaluated the technical capabilities of six different aircraft proposed by six different small business concerns in fourteen separate proposals. This evaluation process consisted of two phases. The Technical Evaluation Team also reviewed the maintenance programs under the various proposals. During its evaluations, the Technical Evaluation Team allotted points for each element in the specifications. These points were merely an aid for the evaluation team and did not determine the acceptability of the various proposals. The record indicates that during Phase I of the evaluations none of the proposals were found acceptable. However, the Technical Evaluation Team informed the offerors of their respective short-comings and each was given an opportunity to address these problems with submitted comments.

During Phase II of the evaluation process the Technical Evaluation Team reviewed the responses of the various offerors to the cited problems in their proposals. In addition, the Technical Evaluation Team viewed a flight demonstration of a Learjet 25G. Apparently, because of the fact that the Learjet 25G was a relatively new aircraft, which, unlike the other aircraft proposed, the Technical Evaluation Team members had not had an opportunity to fly, and the fact that the Technical Evaluation Team found certain factors in the 25G lacking, it determined that a flight demonstration was necessary to thoroughly review

---

5. Stempson wrote as a participant in concert with one or more small businesses which were proposing to lease Gates Learjet aircraft to the USAF using activity at Nellis Air Force Base. He noted that none of the Gates Learjet products had such an external door and he felt such a technical requirement would severely penalize his company. He also asserted that only one aircraft on the market had such an external door and thus competition would be overly restricted. Plaintiff's president, James P. Flynn, contested this assertion that only one aircraft has such an external door. The court notes that the aircraft being proposed by plaintiff had such a door, and that the record indicates that there were other aircraft which could have been but were not proposed which had an external door.

6. Though the court concedes that the contracting officer probably deleted the external door requirement because of pressure from higher officials, the court does not find Gates Learjet's involvement in this matter to have tainted the process. The record indicates that this is all part of the procurement "game." Plaintiff clearly played the game as well when it and Mitsubishi Corporation met with the contracting officer early in the process and showed him a Mitsubishi Diamond 1-A jet after the contracting officer questioned the availability of the Mitsubishi Diamond in a letter dated April 2, 1984.

the plane's capabilities.[7] After reviewing all of the aircraft thoroughly the Technical Evaluation Team found all the proposed aircraft technically acceptable except the Learjet 25D and the Mitsubishi MU–300. The contracting officer subsequently requested best and final offers from all those proposers whose aircraft were found to be technically acceptable.

During Phase II of the evaluations plaintiff's president, James P. Flynn (Flynn), sent to the contracting officer a detailed Telex setting out what he felt were various deficiencies in the Learjet 25G relative to the specifications in the RFP. This Telex was not given to the Technical Evaluation Team. Major George Jenkins (Maj. Jenkins), the chief of the evaluation team, testified that the team would not have considered Flynn's statements concerning the Learjet 25G because the team was to evaluate each proposal objectively and to receive outside data on one particular proposal would taint the evaluation process.[8] In addition, the record indicates that the Technical Evaluation Team thoroughly reviewed all of the problems with the Learjet 25G addressed by Flynn in his Telex and found the 25G to be acceptable with respect to each specification.

On June 11, 1984, after Phase II of the evaluation had been completed, Flynn sent a Telex to the contracting officer expressing his disbelief over the fact that the Learjet 25G had been found technically acceptable. Though the contracting officer discussed this Telex with Maj. Jenkins, it was clear that the Technical Evaluation Team had already made its decision which the contracting officer considered improper to alter based on the disagreement expressed by another offeror. The record indicates that the Technical Evaluation Team made a fair and thorough evaluation of all of the proposals presented, and the court believes it would have been inappropriate to reevaluate one proposal after the evaluation process had ended based on the protests of another bidder.[9]

When the best and final offers were opened by the contracting officer he determined that Ratliff Aero's proposal, which included the Learjet 25G, was the lowest responsive bid. After Ratliff Aero was investigated further, the contracting officer determined that Ratliff Aero was also a responsible bidder. Therefore, the contracting officer anticipated awarding the contract to Ratliff Aero. Though the record is unclear as to how Flynn acquired the information, somehow plaintiff's president became aware that Ratliff Aero was to be awarded the contract. By letter dated June 25, 1984, plaintiff formally protested the small business size of Ratliff Aero claiming that its close ties with Gates Learjet precluded it from being considered a small business. The Small Business Administration denied this protest.

In letters, dated June 29, 1984, both plaintiff and Janelle Aviation, Inc. (Janelle), which were the two offerors who proposed utilizing Cessna Citation S–II aircraft, pro-

7. It is apparent that the Technical Evaluation Team, after it had accepted the Learjet 25G's engine provision in phase I of the evaluation, subsequently questioned the acceptability of the Learjet 25G due to the fact that it was not equipped with fan jets though it could be modified to incorporate turbo-fan jet engines. The Technical Evaluation Team consulted with the contracting officer and he concluded the Schedule B of the RFP was controlling and it allowed turbo-fan/turbo jet aircraft which included Learjet 25Gs. Based on this conclusion, and the evaluation team's prior acceptance of the engine in the 25G, the Learjet 25G was allotted the full number of points for the engine specification.

8. Though the court may question the wisdom of some of the methodology used in the evaluation process, Maj. Jenkins made it clear that all of the proposals were evaluated solely upon the representations of the manufacturers of the aircraft. During the evaluation, no outside verification was sought concerning any of the representations made by any of the manufacturers or small business concerns.

9. It is true that Maj. Jenkins, the chief of the Technical Evaluation Team, continued to express concerns about the Gates Learjet 25G after the evaluation team had found it acceptable. However, Maj. Jenkins testified that such concerns were based on his own opinions and that his concerns were immaterial because the Learjet 25G had already been rated acceptable.

tested the technical acceptability of the Gates Learjet 25G to the General Accounting Office (GAO). Plaintiff also sent a copy of its protest to the contracting officer. Again, the contracting officer did not bring this technical protest to the Technical Evaluation Team's attention, which the court considers to have been proper given the fact that the evaluation team had completed its review and had found the aircraft acceptable.

Regarding the protests filed with GAO by plaintiff and Janelle, the contracting officer prepared Statements of Facts and Findings and sent them to the reviewing agencies. The contracting officer testified that these Statements of Facts and Findings were merely expressions of his opinion regarding the facts surrounding the solicitation, the technical acceptability of the proposals and the protests submitted by plaintiff and Janelle. The court feels that some of these statements prepared by the contracting officer contained some inaccuracies,[10] however, the court finds no evidence of any improper action or manifestations of bad faith by the contracting officer surrounding the protests of plaintiff and Janelle.

While the protests were pending, the contracting officer requested that the offerors extend the viability of their offers until a later date so that the offers would not lapse during the protest necessitating a resolicitation. Such extensions of the offers would also ensure that offers existed at the completion of the GAO proceedings. In August of 1984, the contracting officer prepared certain documentation in anticipation of awarding the contract. The contracting officer testified that he prepared the documentation so that an award of the contract could occur as quickly as possible after a GAO decision was rendered, if the protests were denied.

After the protests were filed by plaintiff and Janelle, USAF officials at the Pentagon became aware of the RFP and the interest of TAC at Nellis Air Force Base in leasing four replacement aircraft. When the issue surfaced at the Pentagon, the record makes it clear that several different organizational entities within the USAF Air Staff and the Secretariat's office became involved in different issues created by the RFP. The record also indicates that the diffuse organization of the USAF at the Pentagon created a situation in which certain offices did not know what other offices or lower tiers of authority were doing with respect to different elements within the solicitation at issue.

One office at the Pentagon involved in the issues created by the solicitation was identified as RDCX. Lieutenant Colonel Richard Hampton (Col. Hampton) of RDCX was in charge of evaluating the protests submitted by plaintiff and Janelle to the GAO. After evaluating the protests, he was to submit a report to the GAO stating the position of the Air Force. Col. Hampton sought input from the contracting officer concerning the RFP and technical matters as well as requesting certain information regarding technical matters from Major Tommy Crawford (Maj. Crawford) of the Air Staff office XOXZ. Col. Hampton never submitted a report to the GAO on the position of the USAF regarding the protest because the cancellation of the solicitation rendered the protest moot.

---

**10.** For example, the contracting officer stated that the Learjet 25G evaluation and flight test were conducted by the Technical Evaluation Team in Tucson, Arizona. In fact such tests were conducted in Las Vegas, Nevada. The contracting officer also stated that the evaluation team actually measured the available cargo space in the Learjet 25G. This, however, was not true. Maj. Jenkins testified that the evaluation team did not measure the cargo area because the 25G they observed did not have the same cargo configuration as that of the Learjet 25G proposed in response to the solicitation. Maj. Jenkins did testify that the Learjet 25G did contain the requisite cargo space. For the most part, the facts set out in the contracting officer's statements were accurate. Most of the inaccuracies were essentially immaterial. The remainder of the statements are expressions of the contracting officer's opinions concerning the Learjet 25G and the protests of plaintiff and Janelle. Such opinions were based on the contracting officer's research and his intimate involvement in the process of soliciting for aircraft to replace the Mitsubishi MU–IIs being used at Nellis Air Force Base.

Another office which became involved in the issues generated by the solicitation for aircraft for use at Nellis Air Force Base was the USAF office of the Secretariat. Dr. Thomas Cooper (Dr. Cooper) in the Secretariat's office somehow was apprised of the fact that the USAF was interested in leasing four replacement aircraft for use at Nellis Air Force Base.[11] Dr. Cooper was the Assistant Secretary of the USAF for Research and Logistics. Apparently, Dr. Cooper had previously received clear indications from the United States Congress that it would limit the USAF's leasing activities in order to save money. Sometime in July 1984, Dr. Cooper discussed why the USAF was soliciting to lease additional aircraft with Col. Hampton. Col. Hampton advised Dr. Cooper to contact the requirements people on that issue. There is absolutely no indication in the record, however, that Dr. Cooper's concerns about leasing additional aircraft were ever communicated to the office which ultimately recommended cancelling the RFP. These concerns were independent of the decision to cancel and presumably only manifested themselves in the Air Staff's consideration of the alternative of using existing leased aircraft to perform airlift services at Nellis Air Force Base.

Another Air Staff office at the Pentagon involved in the solicitation matter was known as XOXZ. In July of 1984 Colonel Thomas D. Allbee (Col. Allbee) testified that XOXZ was contacted by General Robert D. Russ (Gen. Russ) in the office of Research, Development and Acquisitions (RD) and asked to ascertain the requirements in the RFP at issue. After Col. Allbee and Maj. Crawford, also in XOXZ, met with Gen. Russ to brief him on the contents of the RFP, they began to evaluate the specifications in the RFP at the request of Gen. Russ to determine whether or not the requirements in the RFP had overstated the minimum needs of the using activity. This review of the specifications, which took place sometime in August and September of 1984, was not performed after the decision to cancel the solicitation was made by higher officials, or at a time when Air Staff personnel had already decided to utilize alternative aircraft.

In reviewing the specifications set out in the RFP, Col. Allbee and Maj. Crawford found several of the requirements to be overstated. Both men were eminently well-qualified to reach such a conclusion. Both were pilots who had security clearance for the classified mission at Nellis Air Force Base. Therefore, Col. Allbee and Maj. Crawford knew what type of aircraft was required for the using activity at Nellis. They concluded that the range, speed, engine, altitude and other requirements normally associated with jet aircraft restricted competition and overstated the minimum needs of the using activity.

While Maj. Crawford was reviewing the specifications in the RFP he was also preparing to brief Gen. Russ, sometime in September, concerning the solicitation at issue in this case. In order to be totally prepared for the briefing, Maj. Crawford also explored alternative sources to fill the mission requirements at Nellis Air Force Base. One alternative investigated by Maj. Crawford during August of 1984 was the use of C–12s and C–21s, under existing leases the USAF had with other companies, at Nellis Air Force Base.[12] Maj. Crawford

11. There is some evidence in the record that he was contacted by a representative of Cessna Corporation.

12. Maj. Crawford contacted Maj. Jenkins at Nellis Air Force Base to inquire about available hangar space to house C–21s on the base. Though the record is unclear, it is also evident that Maj. Crawford discussed the legal implications of utilizing C–12s or C–21s as replacement aircraft at Nellis Air Force Base with other Air Force officials.

The C–12 and C–21 lease programs were part of a project approved by Congress authorizing the Air Force to seek competitive bids from aircraft manufacturers and suppliers to lease aircraft to the USAF. Said leased aircraft were to be used for airlift services then being performed by aged CT–39 aircraft. The USAF solicited bids for such leased aircraft and awarded two contracts. One to Gates Learjet Corporation to lease, 80 C–21 jet aircraft, and a second to Beechcraft Corporation to lease 40 C–12 turbo-prop planes, neither of which was a small

also asked Major Gary Pulliam (Maj. Pulliam) of the USAF Air Staff, who was a airlift systems using officer, about other alternative aircraft which could meet the needs of the mission at Nellis. However, Maj. Crawford's briefing of Gen. Russ never occurred and he never expressed any views to Gen. Russ concerning the cancellation or the use of C–12s or C–21s. Sometime in mid-September 1984, Maj. Crawford overheard Gen. Russ and Major General Michael J. Dugan (Gen. Dugan) of TAC discussing the specifications in the RFP requiring jets. Maj. Crawford testified that the tenor of that discussion indicated that Gen. Dugan could not convince Gen. Russ of the need for jet aircraft at Nellis and thus Maj. Crawford concluded the RFP would be cancelled.[13]

Within the Air Staff at the Pentagon another office which got involved in this matter was RDQ, Office of Operational Requirements. In a memo, dated August 14, 1984, Gen. Russ directed RDQ to draft a letter to Congress relative to the exercise of the option by the Air Force to lease additional C–21 and C–12 aircraft. The letter was apparently not to go out until Gen. Russ so directed. The post script to the memo stated: "Additional 4 acft [aircraft] to be replaced are MU's at Nellis—(*possibly* )." Maj. Pulliam in RDQ received this memo and did not relate exercise of the lease options with replacement of the MU–IIs at Nellis. The record indicates that Maj. Pulliam had no reason to so relate the two notations at that time and the court concludes they were not related.

Maj. Pulliam prepared the letters for Congress as directed and waited for further directions from Gen. Russ. As mentioned earlier, Maj. Pulliam received general inquiries from Maj. Crawford regarding aircraft in general and the C–12 and C–21 lease programs. However, Maj. Pulliam had no knowledge of any inquiries to use C–12s or C–21s at Nellis Air Force Base at this time.

While all of these Air Force offices worked on the individual, but related, projects concerning the solicitation, Col. Allbee and Maj. Crawford (XOXZ) continued to review the specifications in the RFP to determine if they had been overstated. The record is clear that this evaluation was done totally by XOXZ independent of any direction or influence concerning the outcome of the evaluation by Gen. Russ or any other office.

During XOXZ's evaluation of the specifications in the RFP, Maj. Crawford contacted Maj. William Cleland (Maj. Cleland), TAC officer stationed at Nellis, to question him regarding the specifications in the RFP. For some reason, perhaps due to the tenor of his conversation with Maj. Crawford, Maj. Cleland directed Maj. Jenkins to revise the specifications for MU–II replacement aircraft so that they would not exclude propeller aircraft. This revision request was issued on August 27, 1984. On August 28, 1984, Colonel Howard M. Estes (Col. Estes), TAC, submitted to Maj. Cleland revised specifications which would allow turbo-prop aircraft as well as jets to be considered.

Without knowledge that such revisions had been made in the solicitation, in mid-September, Col. Allbee directed Maj. Crawford to draft a letter *recommending* that TAC cancel the solicitation due to over-

business concern. Both lease contracts contained options to acquire small numbers of additional aircraft. The C–12 lease contract initially provided for 10 beddown bases where the C–12s could be located with the option to establish other beddown locations in the future. It was from this existing pool of aircraft that the USAF considered acquiring the planes it needed at Nellis Air Force Base, and it ultimately did so supply this need by utilizing C–12s.

13. Though there is conflicting testimony in the record concerning the hierarchy of command within the USAF, the court concludes that at the very least Air Staff Generals at the Pentagon have power to persuade Generals in the Tactical Air Command and other Air Force commands to change their positions. All of the members of Air Staff who testified also indicated that the Air Staff perceived, as one of its functions, the role of recommending the correction of perceived errors made by other commands.

stated specifications.[14] The decision to cancel was not an effort to avoid the protests filed by plaintiff and Janelle to the GAO. On September 24, 1984, Col. Allbee signed the letter which recommended that TAC cancel the RFP. Col. Allbee testified that he called TAC to give them notice that the cancellation recommendation was on the way.

In a letter dated September 26, 1984, Gen. Dugan, Deputy Chief of Staff Operations, TAC HQ, *requested* that the contracting officer cancel the RFP based on overstated specifications. Gen. Dugan enclosed with his letter an attachment, identical to that enclosed by Col. Allbee, which was a sample letter to be used to inform contractors of the cancellation. The court presumes that Gen. Dugan received Col. Allbee's letter, agreed with its contents and sent out a similar request.

▇ In any event, the contracting officer, Gamble, testified that he received Gen. Dugan's letter by mechanical transmission on September 26, 1984, and immediately informed all offerors of the cancellation by Telex on the same day. Gamble did not receive a copy of Col. Allbee's letter for several days. In his Telex, Gamble did not use the notification language suggested in Gen. Dugan's letter. Gamble indicated that he chose not to use the attached suggested language as notice to the offerors of the cancellation, but instead utilized language consistent with FAR § 14.209(a). His intent in utilizing such regulatory language was to indicate simply that the RFP

had been cancelled. He did not intend to indicate that the using activity *need* no longer existed at Nellis Air Force Base. The record indicates that in procurement terms "requirement" is synonymous with RFP. Accepting this explanation, it becomes clear that there was no inconsistency between Col. Allbee's cancellation letter and Gamble's September 26, 1984, Telex to each offeror or his October 4, 1984, letter to plaintiff.[15] Gamble's September 26, 1984, Telex did not expressly state a reason for the cancellation. It merely quoted the language of FAR § 14.209(a). However, in a letter dated September 27, 1984, to the GAO, with copies sent to plaintiff, Janelle and Ratliff Aero, Col. Hampton stated that the solicitation had been cancelled due to overstated specifications. Upon learning that the solicitation had been cancelled, the GAO issued an opinion on October 9, 1984, dismissing the protests of plaintiff and Janelle as academic.[16]

On October 4, 1984, plaintiff filed a protest with the GAO regarding the propriety of the cancellation. Plaintiff claimed the cancellation action was arbitrary and capricious and not in accordance with applicable regulations. Plaintiff's protest was based primarily on its allegation that the Air Force issued inconsistent reasons for cancelling the RFP: one reason being overstated requirements and the other being that a need for aircraft no longer existed at Nellis Air Force Base. As the court noted earlier, the record indicates no inconsistency in the bases given for the cancellation.[17]

---

**14.** Col. Allbee indicated that he wished to find justification for the specifications because his primary concern was the continued provision of airlift service to the using activity at Nellis. However, based on his knowledge of the mission requirements he felt that aircraft with the capabilities specified were not necessary and thus the solicitation had to be cancelled.

**15.** The contracting officer's October 4, 1984, letter to plaintiff reiterated the fact that the RFP had been cancelled. The contracting officer cited FAR § 14.209(c) as the applicable cancellation provision. The court will discuss *infra* the propriety of utilizing that particular regulatory provision in this case.

**16.** The GAO was informed of the decision to cancel the RFP by Col. Hampton's letter dated September 27, 1984, mentioned above. In the letter, Col. Hampton not only stated the basis for the cancellation, but he also expressed the view that the Air Force now considered the protests of plaintiff and Janelle Aviation to be moot.

**17.** Col. Allbee, Gen. Dugan and Col. Hampton's letters all indicated that the solicitation had been cancelled due to overstated requirements. The contracting officer's September 26, 1984, Telex and October 4, 1984, letter both indicated that the requirement, meaning RFP in procurement terms, had been cancelled. The record neither indicated any inconsistency in these

The GAO denied plaintiff's protest in a letter-opinion dated October 29, 1984. Plaintiff received this opinion on November 1, 1984, and on November 6, 1984, requested that the GAO reconsider its decision.

On the basis of the total record, the court concludes that cancellation of the RFP was accomplished in accordance with applicable law and was not the result of any arbitrary, capricious or bad faith activities on the part of the Air Force.

After the cancellation of the RFP, and during the pendency of plaintiff's first protest to the GAO regarding that cancellation, it became evident that the USAF would not be able to acquire any replacement aircraft for the four Mitsubishi MU–II aircraft then in use at Nellis before the termination of the lease contract between plaintiff and the Air Force. That termination date was November 8, 1984. Noting the potential for interrupted airlift support at Nellis, Captain Patricia Williams (Capt. Williams), the contracting officer at Nellis Air Force Base and Flynn discussed the possibility of the government extending the lease term for an additional 3 months. During October, Capt. Williams conferred with legal counsel to determine whether the option could be exercised.[18] After concluding that exercise of the option was permissible, under the existing circumstances, the contract was amended on October 23, 1984, extending it from November 8, 1984, to February 8, 1985. Plaintiff agreed to this extension.

During the pendency of plaintiff's request that the GAO reconsider its denial of plaintiff's protest of the decision to cancel the solicitation, the record indicates that the wheels continued to grind to a greater or lesser extent, in the various USAF offices at the Pentagon. Air Staff office XOXZ (Col. Allbee, Maj. Crawford, Lt. Col. David J. McCloud, etc.) prepared a Staff Summary Sheet (SSS) dated November 13, 1984, which urged that some action be taken to obtain replacement aircraft for use of Nellis Air Force Base. The SSS noted that the present lease contract was due to expire on February 8, 1985. It was apparent that XOXZ was concerned with providing continued airlift support to the mission at Nellis and it felt that the usually slow Air Force decision-making process needed expedition. This SSS was prepared in part by Maj. Crawford.

Also on November 13, 1984, General David L. Nichols (Gen. Nichols) signed a letter prepared by XOXZ to RD, Gen. Russ, which urged Gen. Russ to act quickly to find a replacement for the aircraft currently in use at Nellis. Gen. Nichols requested Gen. Russ' "support in reviewing the various options to satisfy this requirement." Those options included "re-completion using a modified RFP [recommended changes were set out in the letter] or through an in-house solution." Therefore, it was clear as of mid-November that no official decision had been made on how to replace the Mitsubishi MU–II aircraft then being leased from plaintiff.

statements nor any intent to proffer inconsistent reasons for the cancellation.

**18.** The legal questions were precipitated by the language of the contractual provision giving the government the option to extend the contract. That provision stated:
"Notwithstanding any other provision of this contract, including option provisions, *if offers have been competitively solicited for the continuation of the services provided under this contract,* the Government may extend the then current contract performance period for not less than one month or more than three months on the same terms and conditions as applicable to the then current performance." (Emphasis added.)

The issue which Capt. Williams needed to resolve revolved around the language requiring that offers have been competitively solicited for the continuation of services provided at that point by plaintiff. Given this language, Williams questioned whether the option could be exercised after a solicitation has been cancelled and apparently legal counsel responded affirmatively. It should be noted that although the RFP had been cancelled for overstating the existing needs of the USAF, the possibility of the reissuance of a RFP which stated the minimum needs of the USAF existed and this possibility was reasonably felt to be sufficient to trigger the appropriate use of this option.

On November 29, 1984, Maj. Pulliam received a memo to see Gen. Russ as soon as possible to develop a "gameplan." In context, use of this phrase, "gameplan", carried no sinister, conspiratorial or bad faith connotation that plaintiff wishes the court to draw. Shortly thereafter, either in late November or early December of 1984, the record is unclear as to the date, General Larry D. Welch (Gen. Welch), Vice Chief of Staff of the Air Force, yet another participant in the process, sent the following memo to RD, Gen. Russ:

> Go with recommended changes. Establish an OAS [Operation Airlift Services] location dedicated to Nellis support using C–12s.
>
> Let MAC [Military Airlift Command] and TAC [Tactical Airlift Command] work out pilot manning.
>
> Tell TAC/DO decision.

Maj. Pulliam testified that when he saw a copy of this memo it was the first instance in which he had been formally informed of the decision to use C–12s at Nellis.

Sometime after Maj. Pulliam received Gen. Russ' November 29, 1984, memo and Gen. Russ received Gen. Welch's memo, Maj. Pulliam met with Gen. Russ and others to discuss the use of C–12s at Nellis.[19] At that meeting Maj. Pulliam learned that he was to set up an OAS location at Nellis Air Force Base. Such an effort included amending the C–12 lease contract with Beechcraft Corporation to establish a new beddown base at Nellis, which the Air Force had done previously in the similar C–21 lease contract with Gates Learjet Corporation. Maj. Pulliam also had to organize the transfer of four C–12s from their current beddown bases to Nellis. He referred to this process as essentially reprioritizing the use of such aircraft.[20] Maj. Pulliam had to contact Military Airlift Command (MAC), the command in charge of the C–12s, and have MAC coordinate pilot training with TAC, which had been the command in charge of the airlift support for the classified mission at Nellis. Maj. Pulliam also had to orchestrate the establishment of logistical support at Nellis for the four C–12s. Finally, Maj. Pulliam had to acquire the necessary funding to cover the increased costs incurred by Beechcraft in setting up an additional beddown base at Nellis.

The combined efforts of USAF headquarters, MAC and TAC accomplished these tasks and established a new detachment, designated Detachment 5, 1400 MAS, under MAC to provide airlift support for the 4450 Tactical Group and the 4477 Test and Evaluation Squadron. Such airlift support was previously provided by plaintiff's Mitsubishi MU–IIs under TAC. These Herculean tasks were achieved in a relatively short period of time so that the C–12s were available at Nellis as of February 9, 1985, following the termination date, February 8, 1985, of plaintiff's extended contract.

Presumably after the decision was made to utilize C–12 aircraft to replace the Mitsubishi MU–IIs leased by the USAF from plaintiff and during the time in which efforts were being made to implement that decision, the GAO rendered its second decision on plaintiff's protest regarding the cancellation of the RFP. In an opinion, dated December 3, 1984, the GAO denied plaintiff's protest. The GAO concluded that it was proper to cancel a solicitation which overstated the minimum needs of the procuring agency. In addition, GAO stated in pertinent part:

> In its request for reconsideration, Aviation has supplied information which demonstrates that the Air Force still has

---

**19.** The exact dates of these memos and the meeting with Gen. Russ are unclear from the record. However, it is clear that the memos were sent and the meeting took place in either late November or early December 1984.

**20.** Apparently, all of the C–12s which had been supplied under the lease contract were then being fully utilized at other bases. However, due to the vital nature of the mission at Nellis Air Force Base, the USAF established priorities which required the transfer of aircraft from other bases with lower priority missions to Nellis. One C–12 from Wright Patterson Air Force Base, one from Andrews Air Force Base, and two from Norton Air Force Base were transferred to the using activity at Nellis.

a need to lease aircraft and intends in the future to issue an RFP to meet this need. The Air Force has informally confirmed this information and has reasserted its position that the specifications in the canceled RFP are restrictive. Since procuring agency's are required to cancel solicitations which contain specifications that overstate the agency's minimum needs, our conclusion that the agency properly canceled the RFP is affirmed. *Jarrett S. Blankenship Co.*, B–211582, Oct. 31, 1983, 83–2, C.P.D. ¶ 516.

Insofar as Aviation states that, in response to Aviation's request, the Air Force was unable to state what its minimum needs are, we presume that the Air Force is revising its requirements and that these needs will be specified when the future solicitation for the aircraft is issued.

■ Plaintiff asserts that the findings by the GAO in its October 29, 1984, and December 3, 1984, opinions indicate: (1) that the GAO found that the USAF presented inconsistent bases for the cancellation, and (2) that the USAF had represented that it would resolicit. First, in its October 29, 1984, decision, summarily denying plaintiff's protest, the GAO relied solely on the submissions of the plaintiff. The GAO relied on plaintiff's assertion that the Air Force stated it no longer had a need for aircraft at Nellis. The court has already found that the USAF made no such representation. Therefore, any findings or conclusions by the GAO which indicate that the Air Force gave conflicting reasons for the cancellation were based entirely on the submissions of the plaintiff. Second, the GAO merely presumed that the USAF would revise the specifications and resolicit to fill its needs at Nellis Air Force Base. Apparently, a GAO staff member inferred that the requirement might be resolicited after one of its attorneys talked to Robert L. Brown (Brown), Air Staff, Pentagon, RDCX. The record indicates that this was the only basis for the GAO's presumption that resolicitation would occur. In any event, this presumption was not binding on the Air Force. The court finds that Brown was merely expressing an opinion on what might occur in the future which cannot bind the USAF to a future course of action.

The plaintiff did not file a complaint in this court regarding the cancellation either when it occurred or shortly after the GAO rendered its final decision on December 3, 1984, regarding the plaintiff's protest of the cancellation. In fact, plaintiff waited until February 8, 1985, the final day of its extended lease contract with the Air Force to file its action in this court. It was at that time that plaintiff challenged the cancellation and defendant's failure to resolicit and requested the court to enjoin the Air Force from utilizing C–12 aircraft as replacements for plaintiff's Mitsubishi MU–IIs.

Plaintiff asserts that the cancellation of the solicitation seeking replacement aircraft for those then in use at Nellis Air Force Base was improper. Based upon this alleged improper cancellation, plaintiff seeks injunctive relief from the court, *i.e.*, setting aside the cancellation and ordering a resolicitation. Plaintiff also seeks legal relief in the form of bid preparation costs, either in the alternative to or in addition to the injunctive relief sought.

### 2. *Discussion*

■ In establishing that the cancellation of the solicitation was improper, plaintiff has the burden of showing that the government officials involved in the procurement process " 'lacked a rational or reasonable basis' for their cancellation decision." *Kinetic Structures Corp. v. United States, supra,* 6 Cl.Ct. at 394 (citing *F. Alderete General Contractors, Inc. v. United States,* 4 Cl.Ct. 482, 493 (1984)); *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983); *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)). If plaintiff is unable to make the above showing, it then "must present evidence of a 'clear and prejudicial violation of applicable statutes or regulations.' " *Kinetic Structures Corp. v. United States, supra,* 6 Cl.Ct. at 394 (citing *DeMat Air, Inc. v. United States,* 2 Cl.Ct. 197, 202 (1983)).

Plaintiff must demonstrate its entitlement to injunctive relief by clear and convincing evidence. *Baird Corp. v. United States, supra,* 1 Cl.Ct. at 664. The court finds the issue of the propriety of the cancellation to be primarily a fact question and that is why the court found it necessary to set out such detailed findings of fact, *supra.*

 In establishing whether defendant lacked a rational or reasonable basis for its decision or acted in an arbitrary and capricious manner, the Court of Claims, in *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203 (1974) (hereinafter *Keco II*), set out detailed criteria to evaluate defendant's actions.[21] *See Contract Custom Drapery Service, Inc. v. United States,* 6 Cl.Ct. 811, 817 (1984). These criteria include: (1) a determination of the existence of bad faith on the part of defendant which deprived the bidder of fair and honest consideration of its proposal; (2) a determination of whether a reasonable basis for the administrative decision exists; (3) the degree of proof needed for recovery is related to the amount of discretion entrusted to procurement officials; and/or (4) in some instances, a proven violation of a statute or regulation can be grounds for recovery. *Contract Custom Drapery Service, Inc. v. United States, supra,* 6 Cl.Ct. at 817; *Keco II, supra,* 203 Ct.Cl. at 574, 492 F.2d at 1203. Upon consideration of all of the evidence presented at trial, including witness testimony and numerous documents, the court finds that plaintiff has failed to show, consistent with the above criteria, that defendant acted in an arbitrary and capricious manner in cancelling the solicitation.

 In reviewing the criteria, the first one mentioned above is a showing of subjective bad faith on the part of the procuring officials. It is well settled that there is a strong presumption that government officials act properly. *See Eagle Constr.*

*Corp. v. United States,* 4 Cl.Ct. 470, 479 (1984); *P. Francini & Co. v. United States,* 2 Cl.Ct. 7, 11 (1983). To overcome this presumption, the law requires "well-nigh irrefragable proof." *See Contract Custom Drapery Service, Inc. v. United States, supra,* 6 Cl.Ct. at 817; *American General Leasing v. United States,* 218 Ct.Cl. 367, 374, 587 F.2d 54, 59 (1978). In proving that USAF officials, including the contracting officer, acted in bad faith in this case, plaintiff must show specific intent on the part of these officials to injure plaintiff; for example, by predetermining the awardee or by harboring a prejudice against the plaintiff. *See American General Leasing, Inc. v. United States, supra,* 218 Ct.Cl. at 374–75, 587 F.2d at 58–59; *Robert F. Simmons & Associates v. United States,* 175 Ct.Cl. 510, 515–16, 360 F.2d 962, 965 (1966). In this case the court concludes that plaintiff has failed to meet its heavy burden to overcome the presumption of good faith on the part of Air Force personnel in performing their official duties.

Plaintiff implied or asserted throughout the presentation of its case that (1) the contracting officer and other USAF officials favored Gates Learjet Corporation, and (2) the contracting officer, Gamble, had a personal dislike for plaintiff's president, Flynn, and thus did not fairly consider plaintiff's proposal. There is no persuasive evidence in the record indicating that the contracting officer or any of the USAF procuring officials favored Gates Learjet. The record indicates that all of the offerors in this case, and the manufacturers of the planes which the bidders proposed leasing to the Air Force, were not adverse to lobbying the government. (*See supra* note 6.) It is true that Gates Learjet requested that an external door requirement be removed from the specification and it eventually was so deleted at the direction of higher USAF officials. However, the court finds this to

---

**21.** It is recognized that the court in *Keco II* utilized the test in establishing an entitlement to bid preparation costs. However, the court finds the criteria set out in *Keco II* to be applicable both to determining whether bid preparation costs should be awarded and also to establishing whether the cancellation was proper. *See Eastern Marine, Inc. v. United States,* 5 Cl.Ct. 34, 38 (1984).

be an isolated incident which was all part of the procurement process. The fact that Technical Evaluation Team members requested a demonstration flight of the Learjet 25G was the result of total infamiliarity with the product which had not been shown to them when they previously viewed and flew other aircraft, including the Cessna Citation proposed by plaintiff.

More importantly in this case, the cancellation of the RFP was most detrimental to Gates Learjet Corporation and Ratliff Aero. Ratliff Aero would have been awarded the contract if plaintiff's initial GAO protest had been denied and Ratliff Aero would have leased to the USAF four Learjet 25G aircraft. Instead, after the cancellation, the Air Force opted to utilize C–12 aircraft which are a Beechcraft Corporation product. Therefore, Learjet did not benefit from defendant's action which helps to negate any inference of favoritism toward Learjet.[22]

Throughout the presentation of its case, plaintiff has hinted that there may in fact have been a conspiracy within the USAF to cancel the RFP, alter the specifications to include turbo-prop aircraft, and ultimately utilize C–12 or C–21 aircraft to replace the Mitsubishi MU–IIs. At oral argument, counsel indicated that plaintiff was not alleging a conspiracy as grounds for its claim. Given defendant's obligation to treat all bidders fairly (*see supra* note 22) such a plan could be considered an act of bad faith. The record, however, indicates that no such conspiracy or calculated plan to subrogate the competitive procurement process existed. Plaintiff conceded that the testimony of defendant's witnesses would support a denial of these charges, but plaintiff urged the court to read the documents chronologically and suggested that the substance of such charges would become manifest. The court has done this

but was not able to see such a manifestation without engaging in speculation and innuendo. It is clear that the court cannot base a finding of bad faith solely on such speculation and innuendo. *See CACI, Inc. —Federal v. United States,* 719 F.2d 1567, 1582 (Fed.Cir.1983); *Dynalectron v. United States,* 4 Cl.Ct. 424, 430 (1984).

Without reiterating all the facts, the evidence indicates that many offices within the USAF Air Staff worked diligently to ensure that the procurement process worked in accordance with the regulations while attempting to ensure that airlift support to the vital mission at Nellis Air Force Base continued. While certain offices or individuals reviewed the specifications to ascertain if they restricted competition or overstated the needs of the government, other offices and/or individuals were reviewing alternative sources of airlift aircraft to ensure continued service. It is evident that the decisions concerning alternative aircraft were being made independent of the considerations of the specification modifications. Neither effort directly influenced the other and obviously certain individuals and offices were often oblivious to proceedings in other offices. It is clear that no formal decision to use C–12s at Nellis occurred before the cancellation. It is also clear that in November, after the cancellation, both resolicitation and the use of C–12s were being considered. The court finds no concerted effort on the part of Air Force personnel to utilize the process to infuse C–12s into Nellis Air Force Base while cancelling the RFP. The record clearly indicates that opposed to subrogating the competitive process, the Air Force offices involved attempted to further that process while ensuring continued airlift service for a mission which was, and is, clearly vital to national defense.

**22.** As the court noted earlier defendant was under an obligation to treat all bidders fairly. *See International Graphics, Division of Moore Business Forms, Inc. v. United States,* 4 Cl.Ct. 186, 192 (1983). In this case, plaintiff is the only bidder to protest the cancellation and failure to resolicit when other bidders were prejudiced as much if not more than plaintiff, *i.e.,* Ratliff Aero Sales, Inc. The absence of protests by the other bidders suggests somewhat persuasively that some of them at least did not view the cancellation of the RFP and the failure to resolicit the RFP as improper or legally defective.

It is true in this case that Gamble, the contracting officer, and Flynn had personal differences. Plaintiff asserts that Gamble's statement, made after its first protest to the GAO, that plaintiff was "unethical" is a manifestation of Gamble's personal dislike for Flynn. Gamble made that statement based on the fact that plaintiff was protesting (to the GAO) the fact that the RFP specifications called for fan jets but the Learjet 25Gs, found acceptable, were turbo-jet aircraft. Gamble pointed out that plaintiff acknowledged the provision for two types of engines in its own technical proposal submitted on May 16, 1984. Gamble expressed his opinion that it was unethical for plaintiff to acknowledge that it reviewed "all turbofan and turbojet aircraft" and then after a turbojet is found acceptable, protest such a finding. Gamble also apparently did not like the fact that plaintiff ostensibly waited until after the technical findings to raise the potential inconsistency in the RFP. Given these bases for Gamble's statements about plaintiff, the court is unable to conclude that any personal differences Gamble may have had with Flynn affected either his consideration of plaintiff's bid or Gamble's decision to cancel the solicitation. In addition, the record clearly indicates that the Technical Evaluation Team alone reviewed the various proposals on a technical basis. Gamble had little or no involvement in that process. After best and final offers were received, the record indicates that Ratliff Aero was deemed the lowest responsive bidder and thus entitled to be awarded the contract.

 There was no evidence presented which indicated that plaintiff's proposals were not given full and fair consideration. The court has already stated in its findings of fact that it felt Gamble's actions in refusing to relay plaintiff's protests concerning the Learjet 25G's technical acceptability to the Technical Evaluation Team were

proper under the circumstances. Absent a strong showing that the contracting officer was biased or prejudiced against plaintiff, personal differences between Flynn and Gamble are insufficient to show bad faith. *See Kinetic Structures Corp. v. United States, supra,* 6 Cl.Ct. at 394–95. Based on the evidence before the court, plaintiff has failed to show that any of the procuring officers had a specific intent to injure plaintiff. *See Dynalectron Corp. v. United States, supra,* 4 Cl.Ct. at 430.[23]

The second criteria requires the plaintiff to show no reasonable basis for defendant's decision to cancel the solicitation. First, plaintiff asserts that defendant proffered two inconsistent reasons for cancelling the solicitation and second, plaintiff implied during the presentation of the evidence that the specifications were not in fact overstated. The court has already addressed plaintiff's first assertion in its findings of fact. The record indicates no inconsistency between the stated bases for the cancellation. If anything, the phraseology utilized by various officials to convey the fact of cancellation was different but the reason for cancellation was established, stated and consistent. Plaintiff knew what that reason was and was able to challenge it at the GAO and in court.

During the presentation of evidence at trial, it was evident that plaintiff was implying that contrary to the views of USAF Air Staff personnel, the specifications were not overstated. The record indicates that the specifications were drawn up by the pilots of the using activity at Nellis Air Force Base and they were approved by various higher officials within TAC. The using activity specified jets due to an anticipated increase in the volume of flights required by the mission. Plaintiff implied that absent a revision of these specifications by TAC personnel they should not

---

**23.** The court recognizes that when considering a cancellation of a solicitation, it has stated that only a bad faith rejection of all bids will give rise to a right to recover. *Contract Custom Drapery Service v. United States,* 6 Cl.Ct. 811, 818 (1984) (citing *American General Leasing, Inc. v. United States,* 218 Ct.Cl. at 374, 587 F.2d at 59). However, in this case the court considers it appropriate to review all the criteria, not just the bad faith element, set out above, to determine whether defendant's actions were arbitrary and capricious.

have been changed. With this position the court cannot concur.

Though there was conflicting testimony in the record, the court finds the USAF Air Staff is higher up in the organizational hierarchy within the Air Force than TAC. (*See supra*, note 13.) Though the Air Staff cannot directly overrule TAC decisions, the Air Staff is in a position to make recommendations to correct perceived errors. In this case, Air Staff personnel, particularly Col. Allbee and Maj. Crawford, both pilots with complete security clearance regarding the Nellis mission, reviewed the specifications. With complete knowledge of the requirements of the mission they determined that the specifications restricting the aircraft that were to be used at Nellis to jets were excessive. Maj. Crawford indicated that the pilots at Nellis undoubtedly wanted jet aircraft because they preferred to fly them. Given the knowledge and experience of the Air Staff personnel who recommended a finding that the specifications were overstated, the court finds such a recommendation reasonable. The court thus finds the subsequent cancellation based on overstated specifications to be reasonable. *See American General Leasing, Inc. v. United States, supra*, 218 Ct.Cl. at 374–75, 587 F.2d 58–59.

Plaintiff also implied that there were other primary incentives for the Air Force to find the specifications overstated which prompted the Air Staff to recommend that the solicitation be cancelled. First, it was implied that the USAF cancelled the solicitation to avoid plaintiff's GAO protest. Such a basis for cancellation may render the cancellation unreasonable. Second, plaintiff intimated that the USAF Air Staff orchestrated a plan to cancel the solicitation and then rewrite the specifications to allow for the use of C–12 aircraft at Nellis. Again, if this assertion were proven, the cancellation may be considered unreasonable. When considering reasonableness in the context of these implications, the test is not far removed from the bad faith test. *See Contract Custom Drapery Service, Inc. v. United States,*

*supra*, 6 Cl.Ct. at 817; *Keco II, supra*, 203 Ct.Cl. at 575, 492 F.2d at 1204. The burden on plaintiff to prove these implications is therefore a higher one. *Keco Industries, Inc. v. United States*, 192 Ct.Cl. 773, 784, 428 F.2d 1233, 1240 (1970) (hereinafter *Keco I*). The court finds no support in the record for the assertion that USAF officials cancelled the solicitation to avoid plaintiff's GAO protest. The court, as stated in detail earlier, also found insufficient evidence to conclude that some type of overall Air Force plan existed to cancel the solicitation in order to allow for the use of C–12 aircraft at Nellis.

The third criteria for evaluating the propriety of a cancellation essentially is directed at the degree of proof needed to establish that the decision to cancel the solicitation was arbitrary and capricious. This criteria establishes that the greater the discretion held by a procurement official, the greater the degree of proof needed to show that the cancellation was improper.

In *American General Leasing, Inc. v. United States, supra*, 218 Ct.Cl. at 374–75, 587 F.2d at 58–59, the court stated:

It is settled law that no assurance exists that a contractor will receive an award and that the Government retains, in its discretion, the right to reject all bids without liability, even after there have been extensive negotiations with a bidder. [as cited in *Kinetic Structures Corp. v. United States, supra*, 6 Cl.Ct. at 398].

In addition to case law recognition of the latitude given to procurement officials to cancel solicitations, the applicable regulatory provisions give contracting officials a great deal of discretion to cancel solicitations either before or after bids are opened. *See* 41 C.F.R. §§ 1–2.404–1–1–2.404–3 (1984); FAR §§ 14.209 and 14.404–1–14.-404–3. This degree of discretion possessed by the Air Force procurement officials placed a heavy burden of proof on plaintiff which the court concludes it failed to satisfy.

The fourth and final criteria utilized to establish that the government acted arbi-

trarily or capriciously is a proven violation of a statute or regulation. There were several regulations addressed in this case which must be reviewed at this time. The court notes, however, at the outset, that the proven violation of a regulation need not necessarily provide a ground for recovery. *See Kinetic Structures Corp. v. United States, supra,* 6 Cl.Ct. at 397 (quoting *Keco II, supra,* 203 Ct.Cl. at 574, 492 F.2d at 1203–04); *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 67–71, 617 F.2d 590, 599–601 (1980).

 In considering the propriety of the cancellation in this case, the court is, in actuality, determining whether the bids of plaintiff and the other offerors were considered fully and fairly. *See National Forge Co. v. United States, supra,* at 532. Therefore, in considering potential regulatory violations, plaintiff must show that violation of a regulation is a "factor relevant to a determination that a breach of the contractual obligation of fair consideration * * *" occurred. *Dynalectron Corp. v. United States, supra,* 4 Cl.Ct. at 429 (1984) and cases cited therein. Like the court in *Dynalectron Corp.,* this court finds the following:

> [The] plaintiff has not satisfied the high standard of proof required. It has presented no "hard facts," *CACI, Inc.—Federal v. United States,* 719 F.2d at 1582; *Eagle Construction Corp. v. United States,* 4 Cl.Ct. at 481 (1984), demonstrating that the violation [if one exists] of a regulation intended as guidance for government employees in the performance of their duties, see *CACI, Inc.—Federal v. United States,* 719 F.2d at 1581, denied it the impartial consideration to which it was entitled.

Several regulations were raised in this case which are relevant, to a lesser or greater extent, to defendant's obligation to fairly and fully consider plaintiff's bid. The first such regulation deals with the cancellation of solicitations. There are potentially two different regulations which may be applicable. One is FAR § 14.209 which addresses cancellation of invitations before opening and the other is FAR § 14.404–1 which deals with cancellation of invitations after opening. It is not at all clear in this case which regulation controls.

The facts indicate that the contracting officer opened the best and final offers of the bidders and anticipated awarding the contract to Ratliff Aero. Giving literal meaning to the regulations, it would appear that FAR § 14.404–1 is applicable. Defendant argues, however, that FAR § 14.404–1 is only applicable in procurements involving invitations for bids (IFB). In a procurement with an IFB the opening of the bids is done publicly so that all of the offerors' bids are exposed. Cancelling the solicitation at that point and resoliciting would taint the procurement process because all of the bidders would have basic knowledge concerning their competitors and their respective proposals. Defendant points out that in this case, though the bids were opened in a literal sense, none of the bids were made public until this litigation. Therefore, defendant argues, if the bids were not exposed publicly then there is not the potential for tainting the competitive procurement process as there is with the public opening of an IFB, and, accordingly, defendant felt that FAR § 14.209 was at the time more appropriate under these circumstances.

 Though defendant's argument has merit, the court finds it unnecessary to determine whether this was a cancellation before or after opening as intended by the regulations. The court concludes that defendant's reason for cancelling the solicitation would satisfy the requirements of both FAR § 14.209 and § 14.404–1. FAR § 14.209(a) (cancellation before opening) provides in pertinent part:

> Invitations should not be cancelled unless cancellation is clearly in the public interest; *e.g.,* (1) where there is no longer a requirement for the supplies or services or (2) where amendments to the invitation would be of such magnitude that a new invitation is desirable.

In this case, the court is convinced that the cancellation was clearly in the public inter-

est. The solicitation called for jet aircraft to perform a mission which turbo-prop aircraft could perform. The use of turbo-prop planes would save the taxpayers money. In this case it was necessary to rework the specifications in order to include turbo-prop aircraft and thus a new invitation was desirable which served to justify the cancellation.

Under FAR § 14.404–1(a) (cancellation after opening), defendant must provide a "compelling reason to reject all bids and cancel the invitation." FAR § 14.404–1(c) provides several instances which can supply a compelling reason. They include:

(1) Inadequate or ambiguous specifications were cited in the invitation;

(2) Specifications have been revised;

\* \* \* \* \* \*

(5) Bids received indicate that the needs of the Government can be satisfied by a less expensive article differing from that for which the bids were invited;

\* \* \* \* \* \*

(9) For other reasons, cancellation is clearly in the Government's interest.

Though reasons 1, 2, and 5 do not specifically address the circumstances in this case, *i.e.*, specifications which overstate the minimum needs of the Air Force, the tenor and the intent behind those reasons encompass overstated specifications in a solicitation. This court has recognized that defective specifications may be a compelling reason within the discretion of the contracting officer to reject all bids. *Caddell Constr. Co. v. United States*, 7 Cl.Ct. 236, 241 (1985) and cases cited therein. Therefore, the court concludes that the contracting officer had both a compelling reason to cancel the solicitation and that the cancellation was in the public interest thereby satisfying both regulatory requirements.

Plaintiff also alleges that the contracting officer violated FAR § 14.209(c)(2) by failing to give a reason for the cancellation. It is true that Gamble's September 26, 1984, Telex merely stated that the requirement (RFP) had been cancelled, and thus he did not give the specific reason for the cancellation. The court, however, considers this regulatory violation at most harmless error. Plaintiff and the other offerors were informed of the reason for the cancellation in Col. Hampton's September 27, 1984, letter. The fact that plaintiff was informed of the reason for the cancellation within a reasonable time after it was first informed of the cancellation by the Telex, which was designed to give rapid notice makes the regulatory violation immaterial in this case. *See generally College Point Boat Corp. v. United States*, 267 U.S. 12, 15–16, 45 S.Ct. 199, 69 L.Ed. 490 (1925). Therefore, this regulatory violation is neither of the nature nor magnitude which would entitle plaintiff to relief. Moreover, the court finds it interesting to note that plaintiff never complained about this aspect of the Telex notice before the GAO or otherwise prior to this litigation. Truly this minor regulatory violation was harmless.

Plaintiff also contends that the contracting officer violated FAR § 14.-209(c)(3) by failing to assure the prospective bidders of their opportunity to bid on any resolicitation of bids. Section 14.-209(c)(3) states that such an assurance shall be expressed "where appropriate." In this case the contracting officer was unaware of the future course of action. Even if the contracting officer did speculate that a resolicitation would occur warranting the notice set out in section 14.-209(c)(3), the court again finds that such a regulatory violation is insufficient to warrant any equitable or legal relief in this case. Neither alleged violation of section 14.209(c) denied plaintiff fair and full consideration of its proposal. *See Dynalectron Corp. v. United States, supra*, 4 Cl.Ct. at 429.

Plaintiff also asserts that Gamble violated FAR § 14.208(c). Section 14.208(c) provides:

(c) Any information given to a prospective bidder concerning an invitation for bids shall be furnished promptly to all other prospective bidders as an amendment to the invitation (1) if such informa-

tion is necessary for bidders to submit bids or (2) if the lack of such information would be prejudicial to uninformed bidders. The information shall be furnished even though a pre-bid conference is held. No award shall be made on the invitation unless such amendment has been issued in sufficient time to permit all prospective bidders to consider such information in submitting or modifying their bids. Plaintiff maintains that when Gamble conferred with Gates Learjet on the telephone concerning the possibility of the proposed aircraft having either turbo-fan or turbo-jet engines, Gamble should have informed all of the bidders by amendment regarding his conclusion that either type of engine satisfied the engine requirement in the RFP. To the contrary, the facts indicate that Gamble's failure to amend the RFP was, under the circumstances, reasonable, in accordance with the regulation and in no way prejudicial to plaintiff. Gamble felt that Schedule B of the RFP made it clear that both types of engines were acceptable and thus no amendment to notify the bidders of his conversation with Gates Learjet was necessary. This action appears to be in accord with section 14.208(c). Additionally the court notes that plaintiff's May 16, 1984, Technical Proposal acknowledged that plaintiff had reviewed "all currently available turbofan and turbojet aircraft" before making its proposal. Therefore, the substance of Gamble's conversation with Gates Learjet was neither necessary for plaintiff to submit a bid nor was it in any way prejudicial to plaintiff. Accordingly, the court concludes that Gamble's actions surrounding his conversation with Gates Learjet were not in violation of the regulations and, in any event, in no way denied plaintiff fair and full consideration of his bid.

The other regulatory provisions which were surfaced by plaintiff focus on the small business set-aside aspect of this solic-

itation. It is uncontradicted that the contracting officer made this solicitation a unilateral small business set-aside pursuant to FAR §§ 19.501(b) and (c). Whether this particular set-aside should have been a repetitive set-aside is uncertain on this record, which matter the court will discuss *infra*. At this point whether the set-aside should have been repetitive or unilateral is immaterial because in either case if the set-aside is withdrawn certain notice provisions must be followed. *See* § FAR 19.-506.

In this case, there is a question as to whether the cancellation of a solicitation and the failure to resolicit constitutes a withdrawal of the small business set-aside. Plaintiff views this situation to be such a withdrawal but technically it probably is not. Plaintiff takes this position because FAR § 19.506 requires that notice be given to certain SBA personnel if said provision is applicable. The court feels that generally a withdrawal intended by FAR § 19.506 occurs when a small business set-aside is withdrawn and the solicitation is opened up to all, large and small, business concerns. In this case the Air Force cancelled the solicitation and subsequently utilized aircraft under an existing lease contract. The facts in this case are thus distinguishable from what the court perceives to be the intendment of section 19.506.

Even assuming *arguendo* that a withdrawal of a small business set-aside occurred in this case, the court concludes that the presumed failure of defendant to give the notice required by FAR § 19.506 did not deny plaintiff impartial consideration of its bid. *See Dynalectron Corp. v. United States, supra,* 4 Cl.Ct. at 429. Therefore, even assuming that a violation of FAR § 19.506 occurred, plaintiff is neither entitled to injunctive relief nor bid preparation costs based upon that violation.[24]

24. Even assuming that defendant's actions constituted a withdrawal of the small business set-aside, the record indicates that there was no agency small and disadvantaged business utilization specialist to whom to give notice. It is

also unclear from the record whether a Small Business Administration (SBA) procurement center representative had been assigned to the case. If not, there was no one to notify regarding the withdrawal. Even if there were SBA

On the whole, the court finds that there were no regulatory violations which would render the cancellation decision improper in any way. After considering all of the criteria, in the context of the record before the court, the court cannot conclude that defendant's actions in cancelling the solicitation lacked a rational or reasonable basis or were arbitrary and capricious. To the contrary, the court finds defendant's decision to cancel the solicitation based on specifications, which overstated the minimum needs of the Air Force and restricted competition, was entirely reasonable. Therefore, having found the cancellation to be proper, the court must deny plaintiff's request for injunctive relief and bid preparation costs.

## II. *Resolicitation*

### A. *Jurisdiction*

As part of the injunctive relief sought by plaintiff, it requests the court to enjoin defendant from using C–12s as replacement aircraft for the Mitsubishi MU–IIs previously supplied by plaintiff, and further asks the court to order the Air Force to resolicit the procurement previously cancelled. Plaintiff's request for injunctive relief is primarily based on its assertion that the cancellation of the solicitation was improper. However, plaintiff also requests that the court grant equitable relief in the form of an order directing the Air Force to resolicit the cancelled RFP, even if the court upholds the cancellation.

Having determined that the cancellation was proper, plaintiff seeks to involve the court in matters totally outside the solicitation environment and the parameters of the implied-in-fact contractual basis for jurisdiction under 28 U.S.C. § 1491(a)(3) (1982). A request for injunctive relief in this resolicitation context stretches this court's equitable jurisdiction to its limits and beyond. Following the proper cancellation of the RFP, as discussed above, there was no existing solicitation or bids

responsive thereto which could form the basis for an implied-in-fact contract necessary to confer injunction authority jurisdiction on this court. *See Harris Systems International, Inc. v. United States,* 5 Cl.Ct. 253, 260–62 (1984). *See also, Eagle Construction Corp. v. United States, supra* 4 Cl.Ct. at 480–81; *Golden Eagle Refining Co., v. United States,* 4 Cl.Ct. 613, 618–20 (1984). Having found the cancellation proper, this alternative and/or additional request for injunctive relief is so far divorced from this court's limited implied-in-fact basis for equitable jurisdiction that the court concludes that it does not have equitable jurisdiction over this resolicitation portion of plaintiff's request for equitable relief. *See generally Indian Wells Valley Metal Trades Council v. United States,* 1 Cl.Ct. 43, 45–46, 553 F.Supp. 397, 399 (1982).

### B. *Merits*

Despite the court's view that the resolicitation issue is beyond the limits of its injunctive authority, the court believes it to be prudent to discuss the merits of plaintiff's contention that the Air Force should be required to resolicit the cancelled procurement. The fact that this jurisdictional issue is not clearly settled beyond cavil, combined with the fact that there has been a full trial on the matter lends support to the court's decision to face the merits of plaintiff's assertion.

As in its discussion of the propriety of the cancellation, the court will discuss defendant's failure to resolicit within the confines of determining whether that decision was arbitrary and capricious and lacked a rational or reasonable basis. The court will utilize the same four criteria, discussed in Part I of this opinion, in its consideration of the matter.

The first criteria requires a determination of whether defendant's failure to resolicit was the product of subjective bad faith

---

officials to contact, there is no evidence in the record indicating what they could do to alter the decision of the Air Force to utilize C–12 aircraft.

Accordingly, if there was error in this regard, it constituted harmless error.

and the specific intent to injure plaintiff. *Contract Custom Drapery Service, Inc. v. United States, supra,* 6 Cl.Ct. at 817. Such a showing by plaintiff includes a very heavy burden of proof. *Id.* The court has already found that no concerted plan within the Air Force existed to cancel the solicitation, utilize C–12 aircraft, and never reissue the initial RFP or an amended one. The court also does not believe that a presumption by the GAO that the Air Force would resolicit binds the Air Force in any way to so act. As a whole, the record does not indicate that the decision of the Air Force to utilize C–12s was motivated by bad faith, *i.e.,* a specific intent to injure plaintiff or to benefit a particular manufacturer (Gates Learjet). To the contrary, the Air Force's decision, if anything, hurt all of the bidders equally, evidencing no specific intent to harm plaintiff or others.

The second criteria focuses on whether a reasonable basis existed for the Air Force's decision not to resolicit. The court finds that such a reasonable basis did exist for defendant's decision not to resolicit. First, defendant's decision to utilize C–12 aircraft under an existing lease program as opposed to resoliciting to acquire four aircraft to be leased from the awardee for use at Nellis Air Force Base appears to be consistent with the pertinent regulations. FAR § 8.001 sets out the "[p]riorities for use of Government supply sources." § 8.001(a) states:

(a) Except as required by 8.002, or as otherwise provided by law, agencies shall satisfy requirements for supplies and services from or through the sources and publications listed below in descending order of priority as presented in 41 C.F.R. 101–26.107:

(1) *Supplies*

(i) Agency inventories;

\* \* \* \* \* \*

(viii) Commercial sources \* \* \*

If the C–12 aircraft already under a lease contract can be considered USAF inventory then the decision of the Air Force to utilize C–12s seems entirely reasonable, if indeed not required.

There is conflicting evidence in the record regarding whether the leased C–12 aircraft can be considered inventory of the Air Force. Plaintiff maintained at trial that if the Air Force did not own and service the aircraft they could not be considered inventory. The court, however, finds that it is not unreasonable to include the C–12s in USAF inventory and the record, as a whole, supports such a finding.

The 98th Congress authorized the Air Force to lease aircraft for airlift purposes to replace the aging CT–39 planes. Congress required that the leased aircraft be acquired by competitive bidding procedures. On September 19, 1983, the Air Force awarded a contract after competitive bidding to Beechcraft Corporation for the long-term lease (5 years with a 3-year option) of up to 40 C–12 aircraft (with an option for 5 additional planes). The contract gave the Air Force the option to buy the aircraft at certain time intervals. The lease contract listed ten beddown bases where the aircraft would be located and where Beechcraft would have to set up service facilities. These initial ten bases did not include Nellis Air Force Base. However, the lease contract provided the Air Force with the option of establishing a new beddown base by relocating certain C–12s.[25] The lessor was required to be compensated for such a relocation. This option to essentially use the C–12 aircraft anywhere the Air Force desired persuades the court that the C–12 aircraft could be considered Operational Support Aircraft inventory. Therefore, the Air Force, pursuant to FAR § 8.001(a) was required to determine whether within its system of priori-

25. The contract defined relocation as "the planned peacetime action \* \* \* of permanently or temporarily drawing down [taking one or more planes away from use elsewhere] or closing an OSA beddown base and building up or establishing on [sic] OSA beddown base at an-other CONUS or overseas location." In this case the Air Force drew down three different bases where C–12s were located in order to form a new beddown base at Nellis (*see supra* note 20).

ties it could acquire from its existing inventory four C–12s to be used at Nellis Air Force Base.

There is additional support for finding the Air Force's decision to utilize C–12 aircraft reasonable. The court, in being asked by plaintiff to direct resolicitation at this time, finds that public interest weighs in favor of utilizing C–12s under an existing lease to satisfy the needs of the using activity at Nellis Air Force Base. In this case the public interest can be viewed as a balancing of the competing goals of preserving the competitive nature of the procurement process vs. protecting the governmental interest of national defense and national security. *Isometrics, Inc. v. United States,* 5 Cl.Ct. 420, 425 (1984). The facts in this case warrant a finding that national defense and security concerns outweigh the interests which would be served by ordering a resolicitation. *See Rockwell International Corp. v. United States,* 4 Cl.Ct. 1 (1983).

In this case the mission being supported by plaintiff's Mitsubishi MU–IIs and subsequently by C–12 aircraft, is classified. However, the record did clearly indicate that said mission was of vital importance to this country's defense and security. If this court enjoined the use of C–12 aircraft to support this mission at Nellis, a potential interruption in necessary airlift service could occur during the resolicitation process which could seriously disrupt the mission.

On the other hand there exist the interests of the competitive procurement process. The regulations clearly indicate a preference for procuring "on a competitive basis to the maximum extent possible." 41 C.F.R. 1–1.301–1 (1984). In this case when the Air Force decided not to resolicit it is arguable that it failed to maintain this competitive process.

In balancing these interests several factors should be kept in mind. First, the Air Force did not completely subrogate the competitive process. It initially acquired the C–12s on a competitive bidding basis. In this case, all that the Air Force did was relocate planes it had already acquired in a means consistent with a competitive procurement process although this competition was not tailored solely for the benefit of small business concerns. Second, 28 U.S.C. § 1491(a)(3) is the statutory provision which gives this court its limited equitable jurisdiction. Section 1491(a)(3) states in pertinent part: "In exercising this jurisdiction, the court shall give due regard to the interests of national defense and national security." Based on this statutory language, in cases involving national defense and security, this court "should be very careful and wary before upsetting these procurement decisions [which involved security and defense matters]." *N.V. Philips Gloeilampenfabrieken v. United States,* 1 Cl.Ct. 783, 784 (1983). *See also Southwest Marine, Inc. v. United States,* 3 Cl.Ct. 611, 613 (1983). Third, it is arguable that the Air Force should not have initially solicited for replacement aircraft for use at Nellis Air Force Base because of FAR § 8.001, mentioned above, since the C–12 aircraft were available when the Air Force issued the RFP in April 1984, in expectation of the termination of plaintiff's MU–II contract on November 8, 1984. If that is the case then certainly defendant was under no obligation to resolicit.

Finally, the record indicates that the Air Force acted solely in a manner designed to promote the public interest. The facts indicate that the Air Force carefully weighed the options available to it and chose to utilize the C–12s. Their decision was based on the limited time available before the MU–II contract extension expired, the potential costs of the C–12s vs. the costs of resoliciting for new aircraft (to be discussed *infra*), and the overall minimum needs for support for the vital mission being performed at Nellis. The decision of the Air Force was not motivated in any way by a desire to injure plaintiff or others or to thwart the competitive process.

When all of these factors are balanced against a regulatory policy promoting competitive procurements, the court finds that it must side with the interests of national

defense and national security. The probable delay in airlift services, potentially 6 months for a resolicitation to be completed and pilot training to be accomplished, weighs heavily against ordering a resolicitation and demonstrates the reasonableness of defendant's decision to utilize C–12s. *See generally Rockwell International Corp. v. United States, supra.* Plaintiff's counsel, for the first time at oral argument, stated that plaintiff would be willing to allow the Air Force to continue to utilize the C–12s at Nellis until the resolicitation process can be completed. Of course, when the Air Force decided to utilize the C–12s it did not have at its disposal an interim supply of aircraft to utilize until a solicitation was completed and thus time was of the essence. Therefore, after weighing all the factors the court finds that a reasonable basis for the Air Force's decision in question existed.

The third criteria for determining whether defendant's actions were arbitrary and capricious points out that the greater the discretion held by the procurement officials the greater the burden on plaintiff to show entitlement to a resolicitation. The court has already stated that it is reluctant to interfere in procurement decisions involving interests of national defense and security. *See N.V. Philips Gloeilampenfabrieken v. United States, supra,* 1 Cl.Ct. at 784. The record clearly indicates that the mission being performed at Nellis Air Force Base is vital to national security. The facts also demonstrate that airlift support is necessary for the mission. This court must accord a great deal of deference to the discretionary actions of the Air Force procurement officials under such circumstances. Therefore, the burden on plaintiff to demonstrate an entitlement to a resolicitation is a severe one which, the court finds, plaintiff has failed to meet.

The final criteria focuses on potential statutory or regulatory violations which may have occurred which could render defendant's decision not to resolicit arbitrary and capricious. Plaintiff has cited several regulatory and statutory provisions which defendant may have violated. The first regulatory violation cited by plaintiff is that defendant's failure to resolicit is inconsistent with 41 C.F.R. § 1–1.301–1 which requires the use of competitive procurements to the maximum practicable extent. The court has already addressed this assertion regarding section 1–1.301–1 and, after weighing the interests of national defense and national security, concluded that any potential violation of that regulation is outweighed by the public interest. Furthermore, the court notes that if it ordered a reissuance of the original solicitation, plaintiff would possess the benefit of already having viewed the bids of all the other offerors. Even if an amended solicitation was issued, plaintiff would have been privy to the basic competitive positions of the other offerors. In neither case can it be said that a resolicitation after the disclosure of the bids would most probably promote the integrity of the competitive procurement process and thus serve the public interest. *See Caddell Constr. Co. v. United States, supra,* at 241.

Plaintiff also argues that the Air Force violated the Department of Defense Appropriation Act, Pub.L. No. 98–212, 97 Stat. 1421, 1424 (1983) and Pub.L. No. 98–94, 97 Stat. 679, 696 (1983). Plaintiff maintains that these statutory provisions limited the Air Force to using leased Operational Support Aircraft (OSA), *i.e.,* C–12s, to replace only CT–39 aircraft. It is uncontradicted that CT–39 aircraft were not being used at Nellis Air Force Base for airlift support and the aircraft which were being replaced were the Mitsubishi MU–IIs. The Court, however, finds no language in the statutory provisions cited which limits the use of C–12s to only replacing CT–39s.

Maj. Pulliam testified at trial the Congress' major concern, relative to Pub.L. No. 98–212, *supra,* was authorizing the Air Force to lease aircraft as opposed to buying them. He stated that the Air Force did not feel restricted to only using the C–12s where it had previously used CT–39 aircraft. The court finds this interpretation of Pub.L. No. 98–212's intendment by Maj. Pulliam to be reasonable. *See C & L*

*Constr. Co. v. United States,* 6 Cl.Ct. 791, 805–06 (1984) and cases cited therein. It is true that the leased aircraft were to replace the decaying CT–39s. However, it is reasonable to presume that the new leased aircraft were intended to take over the type of services previously performed by the CT–39s which were airlift support. There is no statutory language limiting where these leased planes could be used. The court thus rejects plaintiff's statutory argument.

Plaintiff also asserts that defendant violated certain regulations dealing with small business set-asides. In particular, plaintiff argues that defendant's conduct was in violation of FAR §§ 19.501(g) and 19.506. Section 19.501(g) provides in pertinent part:

> g) Once a product or service has been acquired successfully by a contracting office on the basis of a small business set-aside, all future requirements of that office for that particular product or service * * * shall, if required by agency regulations, be acquired on the basis of a repetitive set-aside. * * * Withdrawal of a repetitive set-aside will be in accordance with 19.506.

It is uncontradicted that plaintiff's MU–II contract with the Air Force was a small business set-aside. It is also clear that plaintiff provided a satisfactory product and adequate service. Therefore, it is at least arguable that the initial solicitation and any resolicitation should have been repetitive small business set-asides.[26]

Having reviewed FAR § 19.501(g) and plaintiff's argument concerning that regulation, the court is not persuaded that it applies under the facts of this case. If defendant had cancelled the solicitation and then opened up the resolicitation to business of all sizes to propose turbo-prop aircraft, then it would be clear that defendant had violated FAR § 19.501(g). However, in this case, after the cancellation of the solicitation, the Air Force decided to utilize aircraft under an existing lease contract to provide the needed services. The lease contract had an option allowing the aircraft (C–12s) to be relocated and the Air Force amended the contract to provide for the lessor's increased costs associated with the exercise of this option.[27] In this case, it is thus not as clear cut whether defendant must utilize a repetitive set-aside. Plaintiff has cited no authority to support its position regarding a repetitive set-aside and the court finds that plaintiff has failed to satisfy its burden of proving that under the circumstances of this case this should have been such a set-aside by way of resolicitation restricted to small business concerns.

Whether or not this should have been considered a repetitive set-aside, it is clear that the initial solicitation was a unilateral set-aside. *See* FAR § 19.501(c). After the solicitation was cancelled and the Air Force opted to utilize aircraft under an existing lease, such actions can arguably be considered a withdrawal of the unilateral set-aside. As the court discussed earlier, this type of *de facto* withdrawal may not have been the technical form intended by FAR § 19.506. The court believes that section 19.506 was intended to apply in situations when a small business set-aside procurement is changed so that non-small business

---

**26.** The contracting officer initially did not consider the RFP, which was cancelled, a repetitive small business set-aside because the product being solicited was a jet aircraft as opposed to a turbo-prop plane, which the jet aircraft was to replace. The court is of the view that what the offerors were being asked to supply was more a product with incidental service than a service alone, and since the product being procured was different, it was probably proper not to consider the initial solicitation a repetitive set-aside. However, it is arguable that when the Air Force decided that turbo-prop aircraft would meet its needs, at that point a repetitive small business set-aside may have been appropriate.

**27.** As the court stated earlier, it considers these leased aircraft to be part of the inventory of the Air Force. It appears that FAR § 8.001(a) required the Air Force to utilize such planes first if they were available. Whether the C–12s are called inventory or in-house products, the court does not believe it makes any difference that the aircraft were not owned by the Air Force. Plaintiff has not cited any authority to support its restrictive interpretation of in-house products or inventory. The court's reading of inventory is limited to the circumstances of this case.

concerns may compete (*see supra* note 24 and accompanying text). However, if it is assumed that a withdrawal of the set-aside occurred in this case then FAR § 19.506 must be complied with. Section 19.506 is applicable relative to both repetitive and unilateral set-asides.

> Section 19.506 provides in pertinent part: (a) If, before award of a contract involving a set-aside for small business, the contracting officer considers that award to a small business concern would be detrimental to the public interest (*e.g.*, because of unreasonable price), the contracting officer may withdraw the set-aside determination whether it was unilateral or joint. The contracting officer shall initiate a withdrawal, of an individual set-aside by giving written notice to the agency small and disadvantaged business utilization specialist and the SBA procurement center representative if one is assigned, stating the reasons.

In this case there had been no actual award of the contract when the solicitation was cancelled. The contracting officer in this case probably did not consciously determine that the award of the contract to a small business concern in particular would be detrimental to the public interest. Instead, the procuring officials in this case probably determined that a resolicitation and subsequent award of the contract to an outside commercial source of any size would be contrary to the public interest when compared with utilizing the C–12 aircraft under the existing lease.

After reviewing the record in this case, the court finds defendant's decision not to resolicit, but instead to utilize aircraft under an existing lease arrangement, to be reasonable and consistent with the intent of FAR § 19.506(a). Plaintiff attacks the reasonableness of this decision (*i.e.*, would the use of C–12s be in the public interest) based entirely on the dollar cost of the C–12s under the existing lease vs. the cost that the Air Force might incur if plaintiff or other commercial sources were to supply similar turbo-prop aircraft under a resolicitation. Flynn, plaintiff's president, testified that plaintiff could supply the same C–12 aircraft for less money than the costs of the four C–12s under the existing C–12 lease.[28] Both parties presented generalized evidence and arguments on the cost issue. Having considered all of the evidence, the court concludes that plaintiff failed to meet its burden of proof on the issue of costs. Plaintiff clearly failed to consider several important cost factors.[29] After considering all of the factors, the court is persuaded that over the duration of the lease defendant would actually save money utilizing the leased C–12 aircraft as opposed to resolicit-

**28.** Flynn testified that plaintiff could supply the aircraft at a cost of $33,000 per month less than the existing lease figure. The court notes that it has two bases upon which to question the reliability of the estimated figure arrived at by Flynn. One, Flynn had defendant's monthly cost figure to use as a target for setting his own figure. This gave him a large advantage in arriving at his low estimated amount. Two, Flynn's cost figure was only an estimate and not an actual bid to which he would be bound if he was awarded the contract. Such an estimate, under such circumstances, gives the proposer a degree of leeway in viewing his potential costs which serves to detract from the weight to be given such an estimate.

**29.** The factors plaintiff failed to consider were: (1) the costs incurred by defendant in the resolicitation process; (2) the potential cost of the delay in acquiring planes through resolicitation (6 months) which could interrupt airlift services to the mission at Nellis; (3) the cost savings in the long run associated with the economics of scale inherent in possessing a large fleet of identical aircraft; (4) the cost of retraining pilots to fly the aircraft which would be utilized at Nellis after a resolicitation; and (5) the fact that defendant's cost figure ($1,625,000) for the C–12s was a tentative amount which through negotiation could be reduced by 20 percent or more. An additional factor to consider would be the substantial termination costs which the government would incur if this court ordered a resolicitation. The termination cost would result from cancelling the C–12 lease contract amendment provision which allowed four C–12 aircraft to be placed at Nellis Air Force Base. Plaintiff conceded that such termination costs would be incurred.

Plaintiff's burden associated with this cost issue is a heavy one. This court's policy of deferring to procurement decisions involving national defense and security, *N.V. Philips Gloeilampenfobrieken v. United States*, 1 Cl.Ct. 783, 784 (1983), makes plaintiff's burden more onerous.

ing for aircraft from outside sources. The court finds defendant's decision not to resolicit was made in the public interest and thus that portion of section 19.506(a) was not violated.

Plaintiff asserts, however, that defendant failed to comply with the notice provisions of section 19.506. It is uncontradicted that neither the contracting officer nor any USAF procuring official ever notified a SBA representative of the decision to utilize existing leased C–12s and thus not to resolicit. The contracting officer and other Air Force officials testified that they never considered giving such notice.[30] Though this failure to give notice may have been a minor technical violation of the regulation, assuming the regulation to be applicable, the court finds that such a minor violation does not warrant injunctive relief.[31] Not every violation of a regulation mandates a right to relief. *See Keco II, supra,* 203 Ct.Cl. at 573–74, 492 F.2d at 1203–04.

Finally, plaintiff argues that if the use of the leased C–12 aircraft is considered in-house services then defendant was required to comply, by means of cost comparisons of in-house sources vs. commercial suppliers, with FAR § 7.300 *et seq.* and the Office of Management and Budget (OMB) Circular No. A–76, referenced therein, and failed to do so. FAR § 7.300 deals with the acquisition of commercial or industrial products and services subject to OMB Circular No. A–76. Having reviewed sections 7.300 *et seq.* and OMB Circular No. A–76, it is not clear if that regulation requires a cost comparison under the circumstances of this case. For example, it is not clear whether in-house performance would be required for military readiness reasons, as

provided for in the circular, under the circumstances of this case. The court also questions how FAR §§ 7.300 (Contractor Versus Government Performance) and 8.001 (Priorities for use of Government supply sources) interact, if at all, or if they are independent from one another. Plaintiff contends that FAR § 8.001 is inapplicable because the contract to supply such aircraft is a service contract and not a supply contract.[32] As stated earlier, the court does not concur with the view that the provision of aircraft for use at Nellis Air Force Base is a service. On the whole, the court is not persuaded that defendant violated section 7.300. Plaintiff has offered only naked allegations to that effect which fall far short of the burden placed on it in this type of case.

The court concludes that plaintiff has failed to show any significant violations of any applicable statute or regulations which would warrant the issuance of injunctive relief. The court also concludes that plaintiff has failed to meet its heavy burden of demonstrating bad faith on the part of any procuring officials in deciding not to resolicit for replacement aircraft for use at Nellis Air Force Base. The court is persuaded that the Air Force decision to forego resolicitation and to utilize C–12 aircraft under an existing lease contract was reasonable, consistent with the public interest, and not arbitrary and capricious in any way. Therefore, on the merits, the court denies plaintiff's request for injunctive relief ordering a new solicitation.

## III.

### Conclusion

Based on the above discussion, the court concludes that plaintiff is not entitled to

---

30. Presumably, they felt no notice was necessary because this case did not involve a technical withdrawal within the purview of FAR § 19.506. Additionally, the contracting officer was not involved in the decision not to resolicit and thus he would not have been the procuring officer responsible for giving notice to a SBA representative.

31. There is no evidence in the record that there were any SBA representatives assigned to this case to whom to give notice. Plaintiff has also made no allegations regarding how such notice

may have affected the decision of the Air Force not to resolicit or how he was prejudiced by the lack of such notice.

32. Such a distinction is unpersuasive because section 7.300 encompasses "products and services" and section 8.001 deals with "supplies and services". Both regulatory sections deal with services and thus even under plaintiff's view that the provision of aircraft at Nellis is a service, either section could apply.

either equitable or legal relief, with the result that its complaint is to be dismissed.