## ARROWHEAD METALS, LIMITED

v.

## The UNITED STATES.

### No. 291–85C.

United States Claims Court.

Sept. 19, 1985.

Jonathan B. Hill, Washington, D.C., attorney of record for plaintiff. Leslie H. Wiesenfelder and Dow, Lohnes & Albertson, of counsel.

Michael T. Paul, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, attorney of record for defendant. Barbara Fredericks and Florence Bridges, Dept. of Treasury and Kenneth Gubin and Myles Forman, U.S. Mint, of counsel.

## OPINION

LYDON, Judge:

This contract case involves the cancellation of a solicitation by the Department of the Treasury, United States Mint (Mint) subsequent to the opening of sealed bids. Plaintiff, claiming it was the low bidder at bid opening, challenges the legal viability of the cancellation action by the Mint. Plaintiff has filed a complaint for declaratory and injunctive relief and concurrently filed a motion for a preliminary injunction. Plaintiff requests the court: to declare the cancellation of the solicitation in question to be invalid; to order the Mint to reinstate the solicitation and award the contract to the lowest bidder; to enjoin the Mint from awarding the contract to anyone other than plaintiff; and to award plaintiff litigation and bid preparation costs and reasonable attorney fees. Defendant has responded to plaintiff's request for declaratory and injunctive relief by moving for summary judgment. After rather extensive discovery, both parties have provided the court with briefs supported by substantial documentation. Neither party sought a hearing on the matter. After oral argument, the court concludes that plaintiff is not entitled to the equitable remedy of injunctive relief, nor is plaintiff entitled to any legal relief.

### I.

#### A. Background Statement

In order to place this case in proper perspective, the following information regarding coinage production is deemed helpful. Article 1, Section 8, clause 5 of the United States Constitution confers on Congress the power "To coin money." Thus, it is not unreasonable to view broadly the coining of money to be a government function. The actual process of coining money involves a series of steps. As a first step, virgin metal must be transformed into coinage "strip" through the use of a melting furnace and rolling mill. These strips are processed as continuous sheets of metal rolled into coils weighing thousands of

pounds. Each strip is over a foot wide and is approximately as thick as the coins that will be made from it.

The second step in the production of coinage is called "blanking." This operation involves cutting circular discs of the appropriate coinage diameters out of the strips. These blanks are then annealed (treated with heat) in order to soften the metal. While the annealed blanks are still soft, edges are specifically shaped to aid the coining operation. This process is called "upsetting."

Blanks that have been annealed and upset are ready to be minted into coins. The appropriate coinage design is impressed onto the blanks through the use of coin discs, applied under heavy pressure, a process known as to "strike" the coinage blanks.

The United States Mint was created in 1792. Up until 1965, the Mint produced its own coinage strip. After the metal content of the nation's coinage was altered in 1965, the Mint began to purchase varying amounts of coinage strips for cupro-nickel coins (5 cents) and cupro-nickel clad coins (10 cents, 25 cents, 50 cents) from the private sector through competitive bidding. Since 1982, when the Mint closed its only rolling mill, it has purchased all of its strip requirements for cupro-nickel and cupro-nickel clad coins from private firms.

From its creation in 1792, the Mint has performed its own blanking, annealing and upsetting for coins in the above denominations. In 1982, the Mint began to study the possibility of contracting out the blanking of cupro-nickel and cupro-nickel clad coins. Also in 1982, the Mint began to contract out the blanking, annealing, and upsetting operations for pennies. Because of cost factors, the Mint decided to continue performing the nickel operations in-house.

After the President's Private Sector Survey on Cost Control, known as the "Grace Commission Report," was submitted to Congress on July 13, 1983, and in accord with Office of Management and Budget (OMB) policy, as expressed in Circular A-

76, the Mint decided to re-evaluate its present practice of performing its own blanking, annealing and upsetting. The Director of the Mint ordered that a study be undertaken, pursuant to Circular A-76 (revised August 4, 1983) which stated it was government policy to use private sources for government commercial activities in appropriate circumstances. Circular A-76 also stated, however, that: "Certain functions are inherently Governmental in nature, being so intimately related to the public interest as to mandate performance only by Federal employees. * * *" At the time the Director of the Mint ordered the study, she was of the view that blanking was sufficiently distinct from the actual stamping of the coins such that it would not be considered part of an inherently Governmental function and thus not contrary to the above language of Circular A-76. As part of this study, solicitation USM 85-03 was issued. The solicitation's basic purpose, according to the Director of the Mint, was to gauge the savings that might be generated if the Mint turned the blanking, annealing and upsetting processes over to the private sector. Prior to the time the solicitation was issued, there is no indication in the materials at hand that the Mint had undertaken to publicize its intent to contract out coinage blanking function, nor had it informed its congressional overseer subcommittee of its intentions in this regard.

### B. *Operative Facts*

Plaintiff is a Canadian corporation with its principal place of business in Toronto, Canada. It is in the business of processing copper and copper alloys. Presently, plaintiff processes and provides coinage strip for 1-cent and 5-cent coins to the Royal Canadian Mint.

On January 14, 1985, the Mint issued an Invitation For Bids (IFB or solicitation), USM 85-03, for the processing and fabrication and delivery to the Denver, Colorado Mint of certain coinage blanks, *i.e.*, performing the blanking, annealing and upsetting processes on cupro-nickel and cupro-nickel clad strip. Bids were to be sub-

mitted on the base price for cut blanks for the initial period (fiscal year 1986) and two option periods (fiscal years 1987 and 1988). Plaintiff was fully qualified to process, fabricate and deliver coinage blanks. Under the solicitation, Mint supplied metal was to be processed into coinage blanks. The solicitation provided that if the contractor's plant was located outside the United States, the Mint would "provide the virgin metal f.o.b. vessel, port of shipment." These blank coins were then to be returned to the Denver Mint where the Mint was to "strike" the coinage blanks to make 5 cent cupro-nickel and 10, 25 and 50-cent cupro-nickel clad United States coins. The solicitation specifically advised of the possibility that the solicitation might be cancelled if it turned out to be cheaper to produce blank coins "in-house" within the Mint rather than having it done by an outside contractor. The solicitation, as amended, also advised bidders that pursuant to Section 302 of the Trade Agreements Act of 1979, 19 U.S.C. § 2512(a) (1982), and applicable Federal Acquisition Regulations, bids offering eligible products of countries which are not designated under the Trade Agreements Act, 19 U.S.C. § 2511(b) (1982), would not be considered and would be rejected as nonresponsive.

On February 25, 1985, the Chairman of the Consumer Affairs and Coinage Subcommittee of the House of Representatives and twenty of his colleagues sent a letter to the Secretary of the Treasury urging the Department to withdraw the Mint's USM 85–03 solicitation. In support of this request, the letter stated in pertinent part that "[t]his solicitation is likely to lead to the award of a contract to foreign sources to provide the United States with blanks from which to manufacture coins. The award of the contract to a foreign bidder would have adverse effects on the United States." Some of the adverse effects listed in the February 25, 1985 letter were exacerbation of United States trade deficit by exportation of jobs associated with strip manufacture and increase in use of foreign copper and nickel in coin production; creation of unnecessary risks by reliance on foreign sources to supply coin blanks, *e.g.*, risks inherent in long sea voyages, time factors involved in quality control problems relative to replacement of defective blanks; and debasement of the most well-established coin system in the world by having "Coins of the realm * * * produced outside of the realm." The Chairman also issued a press release on the same day dealing with coinage production work being done by the private sector rather than by the Mint. The Mint thereafter received further congressional and public objections to the solicitation for various reasons.

Companies from the following foreign countries requested copies of the Mint's coinage blank solicitation, USM 85–03: the Federal Republic of Germany; the United Kingdom; Mexico; Korea; and Canada. In early March 1985, the Mint was faced with the question as to whether foreign firms were excluded from bidding on contracts to provide coinage blanks. The view was expressed that under the Trade Agreements Act of 1979, 19 U.S.C. §§ 2501–2582 (1982), the Mint was obligated to consider all bids from eligible foreign countries. The preference for American goods expressed in the Buy American Act, 41 U.S.C. § 10c (1982), was felt to be effectively neutralized by the Trade Agreements Act of 1979, *supra*. Under authority of the Trade Agreements Act of 1979, President Carter, by Executive Order 12260, dated December 31, 1980, 46 F.R. § 1653, waived the Buy American Act with respect to a number of countries, among which were the Federal Republic of Germany, Canada and the United Kingdom. The countries of Mexico and Korea were not so designated and thus were outside the pale of the Trade Agreements Act of 1979. The Counsel to the Mint advised the Director of the Mint on March 4, 1985, that, in his view, firms from countries designated under the Trade Agreements Act of 1979, *supra*, such as the Federal Republic of Germany, the United Kingdom and Canada, were fully able to compete for United States Government contracts.

The original bid opening date of February 28, 1985 was changed, by amendment to the solicitation, to March 4, 1985, and changed again, by amendment, to March 8, 1985. On March 8, 1985, plaintiff submitted its bid in response to solicitation USM–85–03 for the processing, fabrication and delivery of 5-cent coinage blanks. On March 8, 1985, the sealed bids were opened. The bids, per the solicitation, were broken down into bidders Using Government Equipment and bidders Not Using Government Equipment. Plaintiff's bid was based on Not Using Government Equipment. The Mint Bid Price Summaries and Abstract comparing adjusted bid prices with the Denver Mint bids disclose that the lowest bid for annealed and upset cupro-nickel blanks for 5-cent coins was submitted by plaintiff. The plaintiff's low bid of $10,045,487 (for 3 years) when compared with the Denver Mint's bid of $14,366,038 (for 3 years) reflected a difference of $4,320,551 for annealed and upset cupro-nickel blanks. While plaintiff is wont to stress this $4 million difference, the materials at hand suggest that the actual savings or bid price differential was considerably less. One other bidder in this category for 5-cent blanks, presumably a domestic company, submitted a bid of $17,283,719 (for 3 years). While plaintiff, a Canadian firm, was the low bidder on the cupro-nickel portion of the solicitation, an American firm was the low bidder on the cupro-nickel clad portion of the same solicitation. There was some question as to whether the low bidder on the cupro-nickel clad portion was "responsible," a determination that was not finalized since the solicitation was cancelled. A foreign firm was second low bidder on the cupro-nickel clad portion.

On April 9 and 10, 1985, a contract specialist from the Mint, together with several other Mint employees, made a pre-award survey of plaintiff's facilities in Canada. While no formal determination as to responsibility was ever made, no problem was uncovered during the survey that would have prevented an award of a contract to plaintiff. A pre-award survey of the facilities of the low bidder on the cupro-nickel clad portion of the solicitation was also made.

What had heretofore been basically a letter-writing campaign voicing opposition to anyone but the Mint performing coinage production work took on a legislative bent in April 1985. The solicitation, to say the least, was controversial and captured public attention. On April 23, 1985, the Chairman of the House Subcommittee on Consumer Affairs and Coinage introduced an amendment in the nature of a substitute to the Mint Authorization Bill. This proposed amendment provided, *inter alia*, that in order to protect the national security interest through domestic control of the coinage process, the Secretary of the Treasury would be required to buy metals mined domestically unless the metal was not mined in the United States or its territory or possession or was not mined in sufficient and reasonably available commercial quantities domestically. Further, the proposed amendment provided that in order to protect the national security interest through domestic control of the coinage process, the Secretary of the Treasury was required to acquire such articles, materials, supplies and services as have been produced or manufactured in the United States unless the Secretary determines it to be inconsistent with the public interest, or the cost to be unreasonable. Notwithstanding testimony by the Director of the Mint in opposition to the proposed amendment, it was passed with bipartisan support by the House Subcommittee. The amendment went no further.

The solicitation problem produced two high-level meetings of Mint and Treasury Department personnel in April 1985. These meetings dealt with various objections that were raised relative to the solicitation. One objection which the Director of the Mint received from the Chairman of the Consumer Affairs and Coinage Subcommittee of the House was that the solicitation might compromise an inherently governmental function. The Mint, when it issued the solicitation, had not felt that blanking was a governmental function. Discussions

at these meetings suggested blanking might well be an inherently governmental function. If so, then OMB Circular A–76 (and the policies it reflects) would not apply since it was not meant to cover inherently governmental function. The meetings produced agreement that whether blanking was an inherently governmental function involved a difficult policy issue needing further consideration and decision by the highest authority.

On April 30, 1985, the Director of the Mint wrote the Chairman of the Consumer Affairs and Coinage Subcommittee of the House of Representatives as follows:

> The Department's initial interest in exploring the practicality of contracting out the manufacture of cupro-nickel and cupro-nickel clad coin blanks, as opposed to the Mint's current practice of purchasing coinage strip and processing it into blanks in-house, was formalized in solicitation, USM 85–03. This solicitation, which requested that the prospective contractor do the blanking, was prompted in part both by a Grace Commission recommendation as well as a productivity improvement study (under the Office of Management and Budget's A–76 circular) that pointed to the potential for cost savings if the Mint were to turn to the private sector for the blanking process.
>
> It was only recently, however, that Secretary Baker and top management personnel assumed their new responsibilities. Therefore, in order to allow them the opportunity to review and to weigh the implications of the policy decision possibly to go outside for blanking, rather than maintaining it in-house with the Mint, solicitation USM 85–03 will be cancelled immediately.
>
> This action will afford the appropriate management personnel a sufficient amount of time during the remainder of the fiscal year to review all pertinent factors necessary to arrive at a final decision on this matter.
>
> As in the past, the Mint will continue to buy coinage strip from the private sector.

> Please let me know if I can provide you with any further information.

It is to be noted that the Director advised that the Mint would continue to buy coinage strip from the private sector. Because the various bidders under solicitation USM 85–03 did not segregate strip costs in their bids, presumably no competitive information relative thereto was disclosed. The Director of the Mint advised it was the Mint's intention fully and fairly to consider all bids, foreign and domestic, for cupro-nickel and cupro-nickel clad strip relative to future solicitations for strip. Subsequent to cancellation of IFB USM 85–03, the Mint awarded a contract under solicitation (IFB) USM 85–12 for 5-cent strip. The bids submitted pursuant to IFB USM 85–12 were opened on April 11, 1985. Plaintiff was a bidder on this solicitation (IFB USM 85–12). However, an American Company was the low bidder on IFB USM 85–12 and was awarded contract TM 85–1029. Plaintiff was advised on May 7, 1985 that it would be maintained on the Mint's Bidder's list for cupro-nickel coinage strip.

On May 1, 1985, the Mint cancelled IFB USM 85–03. The cancellation notice read as follows:

> The Department's initial interest in exploring the practicality of contracting out the manufacture of cupro-nickel and cupro-nickel clad coin blanks, as opposed to the Mint's current practice of purchasing coinage strip and processing it into blanks in-house, was formalized in solicitation, USM 85–03. This solicitation, which requested that the prospective contractors do the blanking, was prompted in part both by a Grace Commission recommendation as well as a productivity improvement study (under the Office of Management and Budget's A–76 circular) that pointed to the potential for cost savings if the Mint were to turn to the private sector for the blanking process. It was only recently, however, that Secretary Baker and top management personnel assumed their new responsibilities. Therefore, in order to allow them the opportunity to review and to weigh

the implications of the policy decision possibly to go outside for blanking, rather than maintaining it in-house with the Mint, solicitation USM 85–03 is hereby cancelled.

This litigation followed on May 15, 1985, with the filing of plaintiff's complaint for declaratory and injunctive relief, as well as limited legal relief, and its motion for a preliminary injunction, to which defendant has directed its motion for summary judgment.

## II.

### A. *Jurisdiction*

 Pursuant to 28 U.S.C. § 1491(a)(3) (Supp.1985) this court has jurisdiction to grant equitable relief in cases involving government contracts prior to award of the contracts. *See United States v. John C. Grimberg Co.*, 702 F.2d 1362 (Fed.Cir. 1983).[1] This jurisdiction includes claims questioning the propriety of bid cancellations. *Aviation Enterprises, Inc. v. United States*, 8 Cl.Ct. 1, 5 (1985), and cases cited therein. This equitable jurisdiction does not, however, include the ability actually to award a contract as requested in plaintiff's prayer for relief. *Contract Custom Drapery Service, Inc. v. United States*, 6 Cl.Ct. 811, 820 (1984), *on appeal*, and cases cited therein. *See also Sea-Land Service v. Brown*, 600 F.2d 429, 432 (3d Cir.1979); *Scanwell Laboratories v. Schaffer*, 424 F.2d 859, 869 (D.C.Cir.1970). The interplay between the court's authority to determine the validity of a cancellation action but its inability to direct award of a contract to any particular entity raises questions about the scope of the court's authority to order reinstatement of a cancelled solicitation and to direct an award to the suing low bidder. The court need not, and does not, enter this thicket in this case.

### B. *Equitable Relief*

Plaintiff has moved for a preliminary injunction, restraining the government "from taking any action as it may relate to the awarding of contracts or solicitations of contracts for the processing, fabrication and delivery of coinage blanks until the merits of this action can be heard by the court." It is not necessary to issue such a restraining order inasmuch as the Mint, the agency involved, does not intend to make any such award or to issue any such solicitation in the foreseeable future, and the merits of the action are now before the court. Plaintiff also seeks a permanent injunction ordering the defendant to reinstate the cancelled solicitation and to award the contract to the offeror with the lowest price, *i.e.*, plaintiff.

 Relative to its request for a permanent injunction, plaintiff has a very high burden of proof to surmount in establishing its entitlement to such relief. With respect to requests for equitable relief in cases involving pre-award procurements, this court stated in *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983): "This court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." *Accord M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971). In short, plaintiff must establish by "clear and convincing evidence" that there was "no rational basis" for the agency's decision. *Baird Corp. v. United States, supra*, 1 Cl.Ct. at 664. Even with such a showing, the court may deny relief where there are overriding public interest concerns.

The critical issue to which these principles apply is, of course, whether it was proper for the Mint to cancel the IFB.

---

**1.** Contrary to the implication of paragraph 2 of plaintiff's complaint, the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* (1982), does not give the Claims Court general power to issue declaratory judgments on matters involving the United States government. *See Williams International Corp. v. United States*, 7 Cl.Ct. 726

(1985); *see generally United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). Rather, this court's power to grant such relief exists only under the limited circumstances of 28 U.S.C. § 1491(a)(3). *Williams International Corp. v. United States, supra*, 7 Cl.Ct. 730–31.

After a review of the relevant facts and the arguments of counsel, the court finds that the plaintiff has failed to show, consistent with the above principles, that the decision to cancel the solicitation had no rational basis.

■ In *Aviation Enterprises v. United States, supra,* 8 Cl.Ct. at 16 n. 21, this court adopted the criteria of *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203 (1974) (hereinafter *Keco II*), for determining whether bid cancellation decisions lacked a rational basis. The criteria include: (1) a determination of the existence of bad faith on the part of defendant that deprived the bidder of fair and honest consideration of its proposal; (2) a determination of whether a reasonable basis for the administrative decision exists; (3) the degree of proof needed for recovery is related to the amount of discretion entrusted to procurement officials; and/or (4) in some instances, a proven violation of a statute or regulation can be grounds for recovery. *Aviation Enterprises, Inc. v. United States,. supra,* 8 Cl.Ct. at 16.

■ As to the first criterion, a showing of subjective bad faith on the part of the procuring officials, plaintiff charges that Mint officials were prejudiced against it because it was a foreign firm. It is well settled that there is a strong presumption that government officials act properly. *See, e.g., Contract Custom Drapery Service, Inc. v. United States, supra,* 6 Cl.Ct. at 817, and cases cited therein. To overcome this presumption, the law requires "well-nigh irrefragable proof." *See, e.g., American General Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 374, 587 F.2d 54, 59 (1978) (quoting *Knotts v. United States,* 128 Ct.Cl. 488, 492, 121 F.Supp. 630, 631 (1954)). In proving that the various Mint officials acted in bad faith in this case, plaintiff must show specific intent on the part of these officials to injure plaintiff; for example, by predetermining the awardee or by harboring a prejudice against the plaintiff. *See, e.g., Aviation Enterprises, Inc. v. United States, supra,* 8 Cl.Ct. at 16, and cases cited therein.

■ In this case, the court concludes that plaintiff has failed to meet the heavy burden required to overcome the presumption of good faith on the part of Mint personnel in performing their official duties.

Although the possibility that the contract would be awarded to a foreign company was undoubtedly a concern to members of the public and some members of the Congress, it is likewise clear that the issue of whether it was consistent with the Mint's responsibilities for it to contract out to the private sector for blanking was also raised. In a news release issued contemporaneously with the letter to Secretary of Treasury Baker, mentioned previously, Representative Annunzio stated that: "[M]any Members of Congress are concerned about letting outside firms, *even American firms,* do the Mint's work." (emphasis added) Representative Annunzio reiterated his concern in his introductory remarks to the House Subcommittee hearing on his proposed amendment to the Mint's authorization bill, characterizing the solicitation as "yet another chapter in the Administration's efforts to turn the Mint over to private industry." This issue was also discussed at meetings of various Treasury officials. The cancellation, in substance, centered on this policy issue. The notice cancelling the solicitation set forth this policy question as the basis for the action taken. Tangential issues as discussed by the parties merely serve to detract from this central, critical policy issue.

The Director of the Mint stated in her affidavit that the opinion of counsel to the Mint that it would be impermissible to ban companies from countries such as Canada from bidding on the solicitation was in accord with her own view that "foreign firms could not and should not be prohibited from bidding on Mint procurements." The Director of the Mint also testified in opposition to the proposed amendment to establish such a ban at the House Subcommittee hearings. Such stated views clearly establish that plaintiff's claim of bad faith on the part of Mint officials is unfounded.

Plaintiff makes much of the fact that the cancellation took place after the bids were opened. However, the record indicates that the intensity of the controversy rose after this time (although not necessarily because of the results of the bid opening). In addition, the Director of the Mint stated in her affidavit that the Mint was fully prepared at that time to award a contract to the lowest responsible bidder, whether foreign or domestic.

Finally, plaintiff remains eligible to bid on Mint procurements for strip and has, in fact, done so. This again indicates a lack of bias or prejudice against plaintiff as a foreign corporation on the part of Mint officials.

 Plaintiff speculates that if plaintiff were not the low bidder and an American firm was the low bidder, the solicitation would not have been cancelled. Such speculation will not support a bad faith assertion. *See CACI, Inc.—Federal v. United States,* 719 F.2d 1567, 1582 (Fed. Cir.1983); *Dynalectron v. United States,* 4 Cl.Ct. 424, 430 (1984). Plaintiff also seeks to have the court draw inferences from the Mint's post-bid opening cost analysis efforts in support of its bad faith contention. The materials at hand, especially the deposition of the Associate Director for Operations of the Mint, will not support any allegation or inference of bad faith relative to the Mint's post-bid cost analysis efforts. This cost analysis effort was engendered for the most part by the $4 million differential between the plaintiff's bid and the Denver Mint's bid. Mint officials wanted to discover the basis for this spread. It was not done to discredit or impugn plaintiff's bid or preclude it from being awarded the contract.

 Further, the concern of members of Congress, and others, regarding Mint operations, will not support plaintiff's bad faith allegations. The House Subcommittee on Consumer Affairs and Coinage, for example, oversees the appropriation and operation of the Mint and properly voices concern about Mint operations. The voices of Subcommittee members and the voices of other congressmen relative to the propriety and justification of certain proposed Mint action on the solicitation in question should not reasonably be ignored by the Mint under the circumstances. Deciding, under the circumstances, that the concerns voiced by Subcommittee members and others raised policy questions about performing coin blanking operations in the private sector that were of sufficient magnitude to require further study and ultimate decision at the highest level of the Department was a rational and reasonable course of action and not evidence of bad faith directed at plaintiff or any other bidder. Accommodation to those who oversee an agency's operations by giving study to their views, especially when a question is raised as to whether a proposed course of conduct is proper, or appropriate or in the national interest, is clearly not irrational. *See John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 390–92, 325 F.2d 438, 442–43 (1963), *cert. denied,* 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964). *See also City of Alexandria v. United States,* 737 F.2d 1022, 1026 (Fed.Cir.1984).

In sum, the uncontradicted depositions of Mint personnel in the record clearly negate the inferences and innuendoes plaintiff attempts to draw from various internal "think tank" memoranda of Mint personnel and the surrounding circumstances. In light of these depositions, such inferences and innuendoes do not constitute the "clear and convincing evidence" needed for injunctive relief based on bad faith conduct of defendant. *See Baird Corp. v. United States, supra,* 1 Cl.Ct. at 664.

 The second criterion requires the plaintiff to show no reasonable basis for the defendant's decision to cancel the solicitation. However, since this case involves a cancellation after the bids were opened, the Federal Acquisition Regulations require a "compelling" reason to justify such action. 48 C.F.R. § 14.404–1(a)(1) (1984). Given the discussion, *supra,* of the concerns as to the propriety and/or national interest factor of contracting out work that an overseeing House Subcommittee and oth-

ers considered governmental function work, a compelling reason existed for cancellation of the solicitation to consider the matter fully. *See P. Francini & Co. v. United States*, 2 Cl.Ct. 7, 10 (1983). As the court finds a compelling reason supporting the cancellation, *a fortiori* it finds the action reasonable.

■ The third criterion involved in evaluating the propriety of bid cancellations focuses on the degree of proof needed to establish that the decision to cancel the IFB lacked a rational basis.[2] Plaintiff essentially contends that the Mint's discretion was so limited that it was bound to award it the contract.

■ Plaintiff's first argument in this regard appears to be that agency discretion was curtailed by the mere act of soliciting for sealed bids. Such a contention is tantamount to saying that the government is bound to award a contract to the lowest responsible bidder in all cases involving sealed bids. It is plain, however, that, as a general proposition, the government has discretion to reject all bids for a variety of reasons. *See* 48 C.F.R. § 14.404–1(c). That is to say, a sealed bid solicitation does not *per se* limit the agency's discretion.

■ Plaintiff's second argument is that by adopting the standards of OMB Circular A–76 in an amendment to the IFB,[3] the Mint lost discretion to consider factors other than price. Again, the court cannot agree. The methodology of Circular A–76 is inapplicable by its terms to operations

that are deemed "government function." Indeed, the circular states that such activities shall not be contracted out. As discussed above, the central issue faced by the Mint was whether the stamping of blanks constituted the coinage of money and thus a governmental function that should not be delegated to the private sector.[4] The court has no trouble in finding that it was rational and within the Mint's discretion to determine that this issue deserved further study. Accordingly, whatever limitation of discretion may be imposed by the strictures of OMB Circular A–76 exists in this case only for purposes of discussion.[5]

■ The fourth and final criterion utilized to establish that the government acted irrationally is a proven violation of a statute or regulation. Plaintiff argues that defendant violated applicable regulations, OMB Circular A–76 and the Trade Agreements Act of 1979, *supra*. The court notes at the outset, however, that the proven violation of a law or regulation does not necessarily provide a ground for recovery. *See Aviation Enterprises, Inc. v. United States, supra*, 8 Cl.Ct. at 20, and cases cited therein. Rather, the plaintiff must show that a violation denied it the impartial consideration to which it was entitled under the implied contract obligations of the government. *See Dynalectron Corp. v. United States*, 4 Cl.Ct. 424, 428–29 (1984), and cases cited therein.

---

2. This criterion does not change plaintiff's ultimate burden of establishing its right to injunctive relief by clear and convincing evidence. Rather, it is an indication of the scrutiny with which agency actions will be examined by the court. If the level of agency discretion is high, then agency action needs less justification to be rational; conversely, in cases where agency discretion is limited, agency action may require stricter accountability.

3. The adoption occurred in Question 4 of Amendment 002 wherein the Mint stated: "The Government's bid will be evaluated along with [*sic* with] all contractor bids in accordance with OMB Circular A–76. If the evaluation proves it is more advantageous for the Government to contract for the blanking operation, contract(s)

will be awarded under this solicitation." *See also* IFB section L.6.0(a).

4. The fact that the Mint has been supplied with blanks for pennies since 1982 merely demonstrates that its perhaps mistaken view of its role has been held for some time. That no opposition was raised demonstrates lack of knowledge as easily as it does acquiescence.

5. In any event, the court does not feel that adoption of OMB Circular A–76 *simpliciter* would necessitate a finding of irrationality where factors other than cost are used in making the final determination in a case such as the one at bar, which involves issues of public concern and policy.

■ The court views plaintiff's argument with respect to a violation of OMB Circular A–76 as merely a restatement of its argument that the Mint lacked discretion pursuant to the terms thereof. Since the cancellation decision was based upon an issue that is the "jurisdictional" prerequisite of OMB Circular A–76, *i.e.,* non-governmental functions, a decision found rational by the court, there is no basis for measuring that decision to cancel against the standards or procedures contained in OMB Circular A–76.

■ Similarly, a close analysis reveals that plaintiff's claim of a violation of the Trade Agreement Act of 1979, *supra,* is merely a refinement of its argument that Mint officials were prejudiced against it. Such an argument cannot be premised on the language of the Act itself inasmuch as the Act expressly denies private remedies not specifically provided for therein. *See* 19 U.S.C. §§ 2504(d) and 2551. *See also Rough Diamond Co. v. United States,* 173 Ct.Cl. 15, 26, 351 F.2d 636, 642, (1965), *cert. denied,* 387 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966). Plaintiff's argument relating to applicability of the Act's provisions appears to be that the thrust of the Act requires equal treatment of certain foreign and domestic bidders that was allegedly denied it because of its Canadian status. This is equivalent, however, to a claim of prejudice; a claim that this court earlier rejected as not supported by the materials before it.

Under F.A.R. § 14.404–1(a), defendant must provide a "compelling reason to reject all bids and cancel the invitation" since the bids had been opened. F.A.R. § 4.404–1(c) supplies several instances that can supply a compelling reason. They include in pertinent part:

(3) The supplies or services being contracted for one no longer required;

\* \* \* \* \* \*

(5) Bids received indicate that the needs of the Government can be satisfied by a less expensive article differing from that for which the bids were invited;

\* \* \* \* \* \*

(9) For other reasons, cancellation is clearly in the Government's interest.

Finally, the compelling reasons justifying the action are to be in writing. F.A.R. § 14.404–1(c).

The notice cancelling the solicitation, while not detailed and expansive, is sufficient to pass the muster of these regulations. The notice clearly indicated that cancellation was related to the necessity for a policy decision on whether the Mint should contract out certain coinage production functions. Such a policy determination "is clearly in the Government's interest."

■ The critical reason given for cancellation was the Mint's desire to review and weigh the implications of contracting out the coin blanking operation. In issuing the solicitation, Mint officials were of the view that blanking was not a governmental function. However, the materials at hand suggest little thought was given the matter since blanking of penny coins had been contracted out without incident since 1982. With the surprising hue and cry about blanking being a government function and concern about potential ramifications of national security aspects of coin blanking by the private sector, especially in foreign countries, the government function aspect of blanking took on added significance. The decision to cancel under the circumstances was thus "compelling," as well as reasonable and rational.

Plaintiff, in its complaint and attendant submissions, stresses the fact that the $4 million differential between its bid and the Mint's bid reflects such a large savings that the national interest dictates that it be granted the injunctive relief it seeks. The Mint was also intrigued with this large differential and thus made a rough cost analysis of the bids. As a result of this rough cost analysis, Mint officials concluded that the more probable cost savings would range from a low of $330,000 to a high of $1.8 million over a 3-year perform-

ance period, assuming options to renew were exercised. The Mint concluded that the savings ostensibly realized by plaintiff lay in the strip cost factor and not in the blanking, annealing and upsetting cost factors. While plaintiff seeks to have the court infer that this cost exercise by defendant was undertaken primarily to support a cancellation action, the materials at hand strongly suggest it was done for the reason indicated above, *i.e.*, to find some explanation for the facial $4 million bid-differential.

■ This cost analysis indicated to some Mint officials that since strip was the source of the savings reflected in the $4 million bid differential, these savings could be achieved by continuing to buy strip in the private sector but keep blanking, annealing and upsetting in-house. Thus defendant suggests this provides another justification for cancellation, *i.e.*, no significant savings in contracting out blanking, annealing and upsetting work. Since the reason given in the notice of cancellation was justification enough for the cancellation, the court need not, and does not, enter the fray between the parties as to whether or not other reasons abound in the materials before the court that would serve to justify the cancellation.[6]

As expected, the parties disagree with respect to whether "cancellation [was] clearly in the Government's interests," and thus in satisfaction of the ninth example of compelling circumstances given in the regulations, *supra*. Plaintiff argues that it was improper for the Mint to consider the actions taken or concerns raised by Members of Congress. The court cannot agree.

In this regard, it finds the following statement in *City of Alexandria v. United States, supra,* 737 F.2d at 1026 to be appropriate:

 * * * Committee chairmen and members naturally develop interest and expertise in the subjects entrusted to their continuing surveillance. Officials in the executive branch have to take these committees into account and keep them informed, respond to their inquiries, and it may be, flatter and please them when necessary. * * * There is nothing unconstitutional about this: indeed, our separation of powers makes such informal cooperation much more necessary than it would be in a pure system of parliamentary government.

■ Rather, the issue is whether these factors affected plaintiff's right to full and fair consideration of its proposal. *See Eagle Construction Corp. v. United States,* 4 Cl.Ct. 470, 479 (1984). The test for improper interference is whether the agency's discretion was co-opted by the desires of others. *Compare Schlesinger v. United States,* 182 Ct.Cl. 571, 581–82, 390 F.2d 702, 708–09 (1968) *with John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 390–91, 325 F.2d 438, 442–43 (1963), *cert. denied,* 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964).

■ Upon review of the record, the court finds that the Mint did not abandon its discretion to the Congress, but rather considered, in the exercise of its own discretion, that the public and Congressional outcry raised issues worthy of investigation—"[i]n the face of this cacophony, it was not unreasonable or imprudent for the

---

**6.** Plaintiff argues that it is improper to utilize *post hoc* justifications to support a cancellation action, citing *Olympia USA, Inc. v. United States,* 6 Cl.Ct. 550, 553–54 n. 1 (1984); *Northern Virginia Van Co. v. United States,* 3 Cl.Ct. 237, 239 (1983); and *Keco Industries, Inc. v. United States,* 192 Ct.Cl. 773, 783, n. 9, 428 F.2d 1233, 1240 n. 9 (1970). Defendant counters by relying on *College Point Boat Corp. v. United States,* 267 U.S. 12, 16, 45 S.Ct. 199, 201, 69 L.Ed. 490 (1924) and a line of Comptroller General decisions, *Universal Telephone Communications Systems, Inc.,* 81–1 CPD § 321; *Non Public Edu-*

*cational Services, Inc.,* 83–1 CPD § 232 for *post hoc* justification of the cancellation.

Plaintiff, relying on OMB Circular A–76, also insists that the government in its cost analysis must utilize historical costs for strip upon which the Denver Mint's bid was based and cannot utilize the latest strip cost data. Under the particular circumstances of this case in which the government is a bidder, the court does not believe that OMB Circular A–76 supports plaintiff's view either by its terms, or, more importantly, by the policies it espouses.

responsible officials at the [Mint] to cancel the procurement and study the issues raised afresh." *Eagle Construction Corp. v. United States, supra,* 4 Cl.Ct. at 480. The decision to cancel was reached only after officials at the Mint had high-level meetings at which the various problems and issues were discussed.

 The court finds that the cancellation served the interests of the government by allowing for further study of the important policy issue of contracting out work that may well involve inherently Governmental functions. Further, such a course of action allows for consideration and definement of the legislative and executive roles and limitations in the critical national policy areas of coinage and potentially national security (integrity of national coinage, risks in private sector, especially plants in foreign countries, *e.g.,* counterfeiting). The court wishes to point out, however, that the desire to avoid legislative-executive controversy is only a legitimate concern where, as here, the parties each have legitimate concerns that must be considered and weighed against the concern of not undermining the fairness and integrity of the procurement system. The scale that balances these important concerns, on the facts in this case, favors upholding the validity of the cancellation.

### C. *Legal Relief*

In its complaint, plaintiff also seeks bid preparation costs. However, its submissions do not discuss in any detail a justification for awarding such bid costs if the cancellation were upheld. The seminal case in the area of recovery of bid preparation costs is *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200 (1974) (*Keco II*).

 Utilizing the *Keco II* standards, the court has held above that the cancellation decision had a rational basis with the result that plaintiff's claim of entitlement to equitable relief was denied. These same standards are equally applicable when considering plaintiff's claim for bid preparation costs. Accordingly, plaintiff's claim for bid preparation costs must likewise be denied due to the rational basis for the Mint's cancellation action.

An additional fact supports denial of bid preparation costs in this case. At the time the solicitation was made, the Mint had no knowledge, or reason to anticipate, that there would be any problems with the solicitation. The Mint had been supplied with blanks for pennies from the private sector for some 2 years without any negative response or challenge to its right to do so. Nor is there any evidence that the Mint bore any prejudices toward any potential bidders. In short, the court feels it is clear beyond cavil that the solicitation was issued in good faith.[7]

### III.

Based on the above discussion, it is determined that plaintiff is not entitled to either equitable or legal relief. Accordingly, plaintiff's motion for a preliminary and/or permanent injunction is denied. Defendant's motion for summary judgment is granted, with plaintiff's complaint to be dismissed.

---

**7.** Moreover, the solicitation itself advised prospective bidders that cancellation thereof may occur if it turned out to be advantageous for the Government to do so. Accordingly, bid preparation costs were an acknowledged risk when incurred. While plaintiff argues that cancellation could only occur on the basis of bid price considerations or monetary savings to the Government, the fact is that regulations provided for cancellation for other compelling reasons. Under the solicitation itself one could be low bidder and thus produce savings to the Government, but not be responsive for other non-monetary reason and therefore not entitled to an award. The point is that price, while certainly an important consideration, is *not* the only consideration when cancellation or award is involved.